## Watson *v.* Watson.

*Tenants in common—Agreement by cotenants that one of their number shall buy the land held in common—Estoppel.*

Where several tenants in common join in a letter directing a mortgagee who is about to foreclose a mortgage on the land held in common, to convey the land absolutely to one of their number on condition that the latter pay the mortgage indebtedness, and a deed is subsequently made in accordance with this direction, the title to the premises passes in the absence of any evidence of fraud or concealment to the grantee, divested of any interest or claim which his former cotenants might have had therein. In such a case parol evidence that the grantee was to hold title for himself and his cotenants, in direct contradiction of the deed and the written direction to the mortgagee, is expressly forbidden by section 4 of the Act of April 22, 1856, P. L. 533 ; nor in such a case can it be contended that the grantee held the property under a trust ex maleficio not subject to the limitation of the 6th section of the act of April 22, 1856, but within the proviso of the 4th section of that act.

It seems that trusts arising ex maleficio which are embraced within the proviso of the 4th section of the act of 1856, are also within the 6th section of that act.

Argued Oct. 29, 1900. Appeal, No. 154, Oct. T., 1900, by plaintiff, from judgment of C. P. No. 1, Allegheny County, March T., 1898, No. 200, on verdict for defendant in case of Mary W. D. Watson *v.* Samuel Watson. Before McCol-LUM, C. J., MITCHELL, FELL, BROWN, MESTREZAT and POT-TER, JJ. Affirmed.

Ejectment to recover an undivided one-fourth interest in land in the tenth ward of the city of Allegheny. Before SLAGLE, J.

At the trial the court directed the jury to find a verdict for the defendant.

Verdict and judgment for defendant.

On a motion for a new trial, SLAGLE, J., filed the following opinion :

This is an action of ejectment to recover an undivided one-fourth interest in ten acres of land in the tenth ward, Allegheny.

The plaintiff claims title as devisee of her husband, Alexander M. Watson, deceased.

The land in dispute is part of a larger tract, about 165 acres, owned by James Watson, father of defendant and of Alexander M. Watson. James Watson, by his will, dated May 15, 1857, proved September 5, 1866, devised said ten acres to his son James, and the remainder of said tract to his six sons, Robert, John, James, Alexander, Charles and Samuel.

John Watson, by will dated August 30, 1875, proved February 9, 1876, devised his interest in said land to Samuel Watson. And Robert Watson, by deed dated November 5, 1868, conveyed his interest in the same to Samuel Watson.

Charles Watson died intestate about 1861, leaving to survive him one son, Charles J. Watson.

Proceedings in bankruptcy were had against Robert, James, Samuel and Alexander M. Watson, and their several interests in said land were conveyed by the register to David Hostetter, who by general deed conveyed the same to Samuel George, Jr.

Samuel George, Jr., by deed dated April 1, 1880, conveyed said interests to Robert Watson, to whom James, Samuel and Alexander, with their wives, by deed of April 3, 1880, conveyed and released all their several interests.

Robert Watson, by mortgage dated August 1, 1885, in which Charles J. Watson joined, conveyed said land to William Thaw to secure a certain indebtedness therein set forth.

Robert Watson died intestate April 8, 1888, and letters of administration were issued to James Watson.

Upon this mortgage a scire facias was issued and judgment obtained for $115,807.67, upon which the property was sold and conveyed to William Thaw by sheriff's deed of July 21, 1888, who by deed of August 25, 1888, conveyed the same to Samuel Watson, taking from him a bond and mortgage for $130,000.

After the issue of the scire facias on the above mentioned mortgage and judgment thereon, a paper dated June 30, 1888, signed by all the heirs at law of Robert Watson, was presented to Mr. Thaw with request as follows : " In case said lands are purchased by you at sheriff's sale, that the same may be conveyed by you absolutely to Samuel Watson upon his securing to you in such manner as shall be satisfactory to you the debt now due to you," etc.

The record showed a title to all this land in Samuel Watson

in fee simple, and the paper of June 30, 1888, freed it from
any implication of trust in favor of his cotenants or of any title
remaining in them by reason of his purchase of the common
property.

The plaintiff claimed that " by arrangement and agreement
between William Thaw and Alexander M. Watson and Sam-
uel Watson, on behalf of said Alexander, James, Charles and
Samuel Watson, and in their behalf, without any consideration
excepting the payment to be thereafter made of the indebted-
ness to William Thaw, deed from said William Thaw and wife
to Samuel Watson, the defendant, dated August 25, 1888, and
recorded in deed book 624, p. 103, whereby the said Samuel
Watson became trustee in behalf of the said Alexander M.,
James, Charles and himself."

After hearing all the evidence in the case the court instructed
the jury that their verdict should be for defendant. This for
several reasons: First, that there was no sufficient evidence to
show any trust; second, that if any trust were created, not
being in writing, it was barred by the statute of limitations;
third, if the evidence was sufficient to show a trust not barred
by the statute, it was an active trust which could be enforced
in equity only, and not such as could be enforced by ejectment;
and we might add that plaintiff's rights had been settled by the
parties by agreement in a former suit for the same land.

There was no formal declaration of trust in favor of Alex-
ander M. Watson or in favor of plaintiff for the land in dispute.
There were certain deeds and writings, offered in evidence which
plaintiff claims recognizes a trust in her favor.

The first in time is an agreement in writing between William
Thaw and Samuel Watson, August 28, 1888; the date of the
deed of Mr. Thaw to Samuel Watson reciting: "Whereas by
reason of the increase in the value of said land it is believed
that the amount of said mortgage indebtedness can be realized
by sale of a portion of said land in lots, but said William Thaw
does not wish to retain the ownership thereof and has been and
is willing to convey the same to the former owners thereof or
to such person as they shall name subject to the payment of the
claims against the same."

2. A deed of Samuel Watson to Charles J. Watson of same
date, August 25, 1888, in which it is recited: "Whereas, the

said land conveyed to Samuel Watson, as aforesaid, though conveyed to him absolutely, was in fact taken by him and has always since been held by him in trust as to an undivided one fifth thereof to Charles J. Watson of Union City, Tennessee, subject to the payment by Charles J. Watson of one fifth of said mortgage indebtedness." And in pursuance thereto a declaration of trust was declared of an undivided one fifth of land after payment of debts, etc., to be conveyed to him. This included the entire farm of 165 acres.

Two other papers were offered in evidence and admitted under objection.

Exhibit "No. 3" was an unsigned memorandum in the handwriting of Mr. Rodgers, Samuel Watson's attorney, and given by defendant to J. D. Watson, son and attorney of Mrs. Watson, the plaintiff, as follows:

"(a) House and 10 acres to be deeded to James Watson in accordance to will.

"(b) Balance to be divided into five parts by five persons, one to be selected by the owner of each interest, and the A. M. W. interest to be deeded to Mrs. W. upon payment of 1-5 mortgage, 1-5 of shaft indebtedness, amounting to about $5,000, also 1-5 of back taxes.

"(c) The brickyard difficulty to be adjusted.

"(d) Release of all claims."

Exhibit "No. 4" is alleged to be a copy of a paper which John D. Watson testified was handed to him by Mr. Woodward, dated May 14, 1892, as follows:

"I propose making the following distribution of the Tenth ward property, viz: After the debts are all paid against the property—Thaw mortg., shaft notes, about $2,000—I will give Jas. Watson, in accordance with father's will, the old homestead and lot around it, also 1-5 of the bal., Alex. M. Watson 1-5 of bal., Chas. J. Watson 1-5 do., Samuel Watson 1-5, also the 1-5 devised to him by his brother John Watson. I am now following the instruction left me by the late W. T., and propose doing so till the debt is paid, when the above distribution of the balance will be made.

"The one sixth left to Robert Watson with the 10 acres extra being used in paying off the debts against the land.

"I also insist upon a correct settlement of the brickyard prop-

erty so that from this on I will have no annoyance or trouble from that source ; and further, I must have an allowance sufficient to compensate me for the management of the whole estate ; and further, until the debt is paid off I shall not be subject to any accounting further than the payment of the debt, the time of distribution." Signed S. W.

These exhibits " 3 and 4 " were objected to because they were unsigned and appeared to be offers of compromise of a suit then pending or threatened.

That suit was brought at No. 511, September term, 1892, in which Mrs. Watson, the plaintiff in that case and this, claimed one half, the whole 165 acres (which included the ten acres now in dispute), after payment of liens and $200,000 to Alexander M. Watson as indorsements for his brothers.

The above offers were not accepted, but afterwards, on September 8, 1892, a deed was executed by Samuel Watson to the Fidelity Title & Trust Company, of all the land except the ten-acre lot, by which he authorized said company to sell all the property then unsold, pay the incumbrances, expenses, etc., and convey the remainder, one undivided fifth, to Charles J. Watson, one undivided fifth to Mrs. Mary W. D. Watson and three undivided fifths to Samuel Watson.

On the same day the suit at No. 511, September term, 1892, was marked discontinued and settled.

This is all the written evidence offered in the case.

It will be observed, that giving full effect to the entire evidence, including exhibits " 3 and 4," which were received under objection, and perhaps should have been excluded, it shows no interest in the plaintiff, but on the contrary is directly antagonistic to her claim. The ten acres now in dispute originally belonged to James Watson. It is true that the trust declared in favor of Charles J. Watson included an undivided fifth of the ten acres. This was probably because he had voluntarily subjected his interest for the benefit of the other cotenants of the remainder of the farm. But in the declaration in favor of Mrs. Watson, this part was expressly excluded, and in the offer of compromise it was proposed to give it to James.

The oral testimony does not add any strength to plaintiff's claim.

There was considerable testimony of a general character tend-

ing to show a trust of some sort, and acknowledgments of its
existence by Samuel Watson.

The property was sold to Samuel George, Jr., by the assignee
in bankruptcy for $30,000. It was bid in by Alexander M.
Watson, and probably with the understanding that it would be
conveyed to Robert. The money to pay for it was furnished
by William Thaw. After its acquisition a coal shaft was sunk
and a brickyard started. For these operations and payment of
taxes, etc., money was furnished by William Thaw, and the in-
debtedness to him increased to over $100,000, for which the
mortgage above referred to was given, in which Charles J. Wat-
son joined.

After the title was vested in Samuel Watson he continued the
brick works, and laid the property off in lots. All the broth-
ers seem to have taken an interest in these operations, and it
was alleged that Alexander M. Watson contributed largely of
money to carry them on. There was, however, no sufficient
evidence to find as a fact that he had contributed money for
such purpose, or if he did, how much, or whether as a loan or as
owner. Samuel Watson denied that he had advanced any
money of his own.

The only testimony as to acknowledgment of specific trust
are as follows:

Mrs. Mary W. D. Watson, after stating why the property
was put in Samuel's name, that is to avoid collateral inheritance
tax and the claim of other heirs of Robert Watson, the property
being and claimed by them held in trust and also to facilitate
sales, says: "After the deed was made to Samuel I always heard
it talked over with Alexander and Samuel that the debts were
to be paid off, and Charles's interest and James's interest to be
paid, and the balance was to be equally divided between Alex-
ander and Samuel."

This was frequently said: "About two weeks before Alex-
ander died he said he would have a paper drawn up and Samuel
should sign it, and he never came back."

"Charles's interest was one fifth, and James's interest was
indefinite, I don't know what."

Mrs. Mary D. Wilson, a daughter of plaintiff, testified to
conversations between her father and Samuel Watson: "I
heard more, especially after my father was sick; heard them

discuss what would be done with the property when the debts were paid and the thing was in better shape.  They always said that Charles and Uncle James should have their interest, and the balance was to be equally divided between my father and Uncle Sam."  She further testified to a proposition that her father should build on the ten-acre tract and go there to live; and that on the night of her father's death Samuel Watson had said that "he would take care of us as father had intended to, —our interest in the place,—that we were equally interested with him."

On cross-examination, she admitted that on a former trial, she said: "They always spoke that Charles should have his share and James should be taken care of in the same way.  I don't know what his share was, but the rest should be divided between my father and Uncle Sam.  And Robert expected to leave his share to pay the debts."  She then explained that the debts referred to were "debts that had been owed to papa— money he had lost in the bankruptcy."

John D. Watson testified, that on the day of his father's funeral, in conversation with Samuel Watson: "He told me that I should tell my mother and the children, the other children, that our interests were the same as his in the property, and not to be anxious or worried about the future, that everything would be all right."

William D. Watson, another son of plaintiff, testified that after his father's death he called on Samuel Watson to get some money due to him, the witness, for hauling in connection with the brick business, when he said: "I ought not to bother him about money, that he was doing the best he could to take care of my mother's children as well as his own."

Under this evidence the court was clearly right in instructing the jury to find for defendant.

The quitclaim deeds of the parties interested vested an absolute title in Robert Watson.  The sheriff's sale to William Thaw and his conveyance to Samuel Watson, upon the written request of all the heirs of Robert Watson, vested in Samuel Watson an unqualified and absolute title in fee simple.

This is not like the case of Tanney v. Tanney, 159 Pa. 277, where the title to property was procured through a tax sale by one tenant in common who was also the agent of the other

owners.  That case and all others which hold that one tenant in common cannot purchase an outstanding title or sale upon an incumbrance, and that the original title remains to the owners, are where the action of one was adverse to others.  The deed to Samuel being made with the consent of all the parties intefested, certainly divested them of all interest in the title.

If, then, any interest remained in the former owners it could only be in the nature of a trust.  Such trust could only arise by fraud in the inception of the title, or by agreement.  In this case there is no allegation that the title was procured by Samuel Watson by any misrepresentation or fraud.

The mere relationship of the parties would not raise an implication of trust as against their written consent.  If, therefore, any trust was created it must have been by agreement. It would therefore come within the provision of the act of April 22, 1856, sec. 4, and not being in writing is void.

But the evidence, if admissible, is vague and uncertain.  Even a writing signed by the party acknowledging a trust must set forth all essential details of the trust : Dyer's Appeal, 107 Pa. 446.

According to the testimony all incumbrances were to be paid and presumably expenses attending management; the James and Charles interest were to be paid.  What they were does not appear.  Charles J. was not liable for any of the indebtedness.  He joined in the mortgage to secure the indebtedness. In equity the indebtedness should be paid out of the other shares. The witnesses could not say what James was to have.  Alexander M. and Samuel were forced into bankruptcy by indorsements for their brothers.  It would be impossible to work out any adjustment of their affairs from any evidence in the case.

But admittedly the title was placed in Samuel Watson to sell lots and pay debts.  This created an active trust, if any, and until this was fully accomplished there could be no right in any other party to possession of the land or any part of it, and therefore an action for ejectment would not lie.  There being no definite trust declared, equity alone would have jurisdiction to ascertain its existence and its character and enforce the rights of the parties under it.  It would involve an accounting which is peculiarly within the province of equity.

We are also of opinion that plaintiff's claim, if any existed, is

barred by the 6th section of the act of April 22, 1856, which provides that "to enforce any implied or resulting trust as to realty" must be brought within five years, unless within that period "acknowledged in writing to subsist."

The true construction of this exception is that the limitation applies to all trusts not evidenced by writing signed by the party. There has been great confusion in the use of terms relating to trusts, "implied," "resulting," "constructive," etc. They are frequently used interchangeably. In this act the word "implied" is evidently used in contradistinction to express trusts. It has accordingly been held to apply to trusts ex maleficio : Christy v. Sill, 95 Pa. 380.

Aside from any consideration of the question of settlement of the controversy by the parties, we are satisfied that the plaintiff is not entitled to recover in this action, and a new trial is therefore refused.

*Error assigned* amongst others was in giving binding instructions for defendant.

*M. A. Woodward,* for appellant.—The plaintiff is a tenant in common with the defendant, in the property in controversy notwithstanding the deed of the title held by him : Tanney v. Tanney, 159 Pa. 277 ; Weaver v. Wible, 25 Pa. 270; Myers's App., 2 Pa. 463 ; Gibson v. Winslow, 46 Pa. 385; DuPlaine's Est., 185 Pa. 334 ; Duff v. Wilson, 72 Pa. 442.

The subsequent admissions and the transaction of Samuel Watson show his acknowledgment that he held his deed subject to the interests of his cotenants, including the plaintiff, in the property.

Samuel Watson holds the legal title in controversy under a confidence and trust for the benefit of this plaintiff and his other cotenants ; not subject to the limitations of the 6th section of the act of assembly of April 22, 1856, but within the proviso of the 4th section of said act : Stratford v. Wheeler, 93 Pa. 462; Beegle v. Wentz, 55 Pa. 374 ; Seichrist's App., 66 Pa. 237.

*W. B. Rodgers,* with him *A. Leo Weil* and *Charles M. Thorp,* for appellee.—The statute of frauds is a bar to plaintiff's claim : Barnet v. Dougherty, 32 Pa. 371 ; Crawford's App., 61 Pa. 52;

Seichrist's App., 66 Pa. 237; Meason v. Kaine, 67 Pa. 126; Squires's App., 70 Pa. 266; Dyer's App., 107 Pa. 454; Salter v. Bird, 103 Pa. 436; Fricke v. Magee, 10 W. N. C. 50; Kellum v. Smith, 33 Pa. 158; Nixon's App., 63 Pa. 279; Dollar Savings Bank v. Bennett, 87 Pa. 382; Kimmel v. Smith, 117 Pa. 192; Salsbury v. Black, 119 Pa. 200; Barry v. Hill, 166 Pa. 348.

But, even if the statute of frauds is not a bar, the parol evidence in this case does not establish a trust: Silliman v. Haas, 151 Pa. 52; Bowen v. Haupt, 192 Pa. 406; Fowler v. Webster, 180 Pa. 610; Dyer's Appeal, 107 Pa. 454.

The plaintiff's claim is barred by limitation of the act of 1856: Silliman v. Haas, 151 Pa. 52; McKean & Co. v. Clay, 149 Pa. 285; Fricke v. Magee, 10 W. N. C. 50; Inlow v. Christy, 187 Pa. 193; Christy v. Sill, 95 Pa. 380; Way v. Hooton, 156 Pa. 8; Barry v. Hill et al., 166 Pa. 350.

OPINION BY MR. JUSTICE MESTREZAT, January 7, 1901:

In his opinion refusing a new trial the learned court below has stated fully the uncontroverted facts and has correctly given the facts deducible from the oral and written testimony. They need not be restated here at length.

The plaintiff in the court below claimed the right to recover the undivided one fourth of the land described in the writ for either or both of two reasons: 1. Because she was a cotenant of the defendant in the property notwithstanding the deed of William Thaw conveying to the defendant the title absolutely, and (2) because the defendant had acquired the title to the premises, including her interest therein, by virtue of a trust, the denial of which converted him into a trustee ex maleficio, thereby bringing her claim within the proviso of the 4th section of the act of April 22, 1856, which excludes it from the operation of the 6th section of that act. The plaintiff urges here the same reasons in support of her appeal.

The court below ruled against the appellant on both positions for the reasons set forth at length in his opinion denying the motion for a new trial. We think the learned judge committed no error in denying the right of the plaintiff to recover on either or both of the two grounds stated.

At the death of Robert Watson, in April, 1888, he was seized

of the ten acres in dispute, and the five sixths of the residue of
the whole tract. The title to the other sixth was in Charles J.
Watson. At that time the Thaw mortgage, which was subse-
quently reduced to a judgment of $115,807.67, covered the en-
tire tract. By the death of Robert Watson the title to the ten
acres and the five sixths of the residue of the tract became
vested in his heirs, viz : three brothers, one sister, a nephew and
a niece. They were then tenants in common with Charles J.
Watson who owned the one sixth of the tract except ten acres,
the title to which was in all the heirs. In this condition of the
title Mr. Thaw foreclosed his mortgage and purchased the prop-
erty and received a sheriff's deed, July 21, 1888. Before the
sheriff's sale, however, to wit: June 30, 1888, all the heirs of
Robert Watson excepting his brother Samuel, but including the
plaintiff's husband, presented Mr. Thaw with a paper contain-
ing the following request: " In case said lands are purchased
at sheriff's sale by you, that the same may be conveyed by you
absolutely to Samuel Watson, upon his securing to be paid, in
such manner as shall be satisfactory to you, the debt now due
to you, and secured upon said lands or interests therein," etc.
Mr. Thaw conveyed the premises to Samuel Watson by deed
dated August 25, 1888, and took from him a bond and mort-
gage for $130,000. The plaintiff contends that notwithstanding
the title thus acquired, the defendant was a cotenant of the
other heirs of Robert Watson, including her husband, in the
property conveyed to him by Thaw, and that Samuel Watson's
title was subject to the interests of his former cotenants. The
counsel for the plaintiff cites in support of his position Tanney
v. Tanney, 159 Pa. 277, and some kindred cases, in which it is
held, inter alia, that where several persons have a joint or com-
mon interest in an estate, one of them may not purchase an in-
cumbrance or outstanding title and set it up against the rest
for the purpose of depriving them of their interests. The reason
of the rule is as stated by DEAN, J., in delivering the opinion
" because it must be presumed that each as regards the com-
mon interest acts for all." In that action which was brought
in 1891, Lewis Tanney, the defendant, being a tenant in com-
mon with his brother and sisters, the plaintiffs, and having
charge of the common property, permitted it to be sold on a
tax lien in 1881, and had another purchase it for him without

the knowledge or consent of his cotenants. It was held that Lewis could not hold the property against the plaintiffs. In delivering the opinion, DEAN, J., says: "The sale resulted from the joint default of all the tenants in common; it was the duty of all to share equally in the payment of taxes, but Lewis had immediate charge of the common property, for he procured the power of attorney for Leslie, and to him Leslie accounted for the rents up to the date of the sheriff's sale; when he purchased with his own money the purchase inured to the common benefit; that is, it discharged the lien for taxes, but their interests were not divested by the sale unless they ratified it." It was also held that the statute of limitations of April 22, 1856, under the facts of record, would not avail the defendant. On this point the opinion says, inter alia: "These plaintiffs are not seeking to enforce an implied or resulting trust; they are demanding possession of the undivided three fourths of their land from which defendant wrongfully keeps them. . . . They claim no benefit from his sheriff's deed, and aver that it cannot affect their rights when they elect to avoid it. In this they are correct. . . . It is not a resulting trust. An implied or resulting trust is where land is purchased in the name of one person and the money paid by another; . . . . or where a conveyance has been obtained by fraud."

The facts of the case in hand do not bring it within the rule laid down in Tanney v. Tanney. If Samuel Watson had purchased the property without the knowledge of his cotenants while he had it in his charge and possession, the two cases would be more similar in their facts. But here bad faith or a lack of performance of duty towards his cotenants cannot be attributed to Samuel on such a state of facts, as they do not exist. On the contrary, he took an absolute title to the premises with the knowledge and acquiescence and at the request of his cotenants, and with every opportunity to them to protect their interests. It should be conceded, as it cannot be denied, that Samuel Watson's cotenants were as familiar as he with the property, the indebtedness, and the necessity for its payment, and all the circumstances concerning the transaction. No concealment or fraud in acquiring the title on the part of Samuel Watson could have occurred, nor is such alleged. There is no allegation that Samuel's cotenants or either of them would have taken the

land and paid the indebtedness, nor that he by any artifice or fraudulent device prevented them from doing so. With a full knowledge of all the facts necessary to protect their interests in the property, Samuel Watson's cotenants directed the lands to be conveyed to him absolutely on the condition that he pay the indebtedness against them. This was an approval of and full authority to the grantor to make the sale and conveyance of the land to Samuel Watson, and when in pursuance of this authority the sale was consummated by the deed of August 25, 1888, the title to the premises passed to him divested of any interest or claim which his former cotenants might have had therein.

Why therefore should the defendant not hold the land for his own use? In doing so there is certainly nothing " repugnant to a sense of refined and accurate justice ; " nor inconsistent with the title acquired by him. His former cotenants were presumed to know that if Samuel acquired the title to the property without their acquiescence, he would, under the law, hold it for them as well as for himself, and hence their interests would thereby be protected. Their knowledge of this fact directs attention to the further fact, that there must have been some purpose in the execution and delivery of the paper of June 30, 1888, and that that purpose was to relieve the title acquired by Samuel from any interests the parties might have in the land by reason of his being their cotenant. When therefore they directed the lands to be conveyed to Samuel absolutely and thus assented to a sale to him, in fee simple, the inference is, that in taking the title he was acting for himself, and that it was the intention of all the parties that the title should be held by Samuel discharged of any trust for, or claim of, his former cotenants. He had the right to decline to take the title on any other terms and it is a fair and reasonable presumption arising from the direction contained in the paper of June 30, 1888, that he had refused to take it with the indebtedness thereby incurred, until his former cotenants relieved it from any claim they might have against it. Such, evidently, was the intention of the parties to the transaction as well as the effect of the deed to Watson supplemented by the paper addressed to Mr. Thaw, and therefore he held the property divested of any incumbrances or claim of his former cotenants which could, after a lapse of ten years, consistent with equity or justice be asserted against it.

But it is claimed that the oral testimony as well as the written evidence produced by plaintiff should have been submitted to the jury on the question of " the true character of the transaction, how it came about, and how Mr. Watson by constant admissions and acknowledgments held the title for and on behalf of himself and his brothers for over four years after the deed was made to him by William Thaw, August 25, 1888." In other words the jury should have been permitted to determine from the evidence submitted whether Samuel Watson accepted the deed and held the title from Thaw under a parol agreement with his former cotenants that he would hold the property for himself and his brothers, subject to the payment of the indebtedness.    Let it be conceded that under the testimony the jury would have found such to be the fact.    We then have the plaintiff showing that by a parol agreement the defendant agreed to take and hold the property not in fee simple and solely for his own use as the deed made to him by direction of his former cotenants declares, but in trust for them.    The offer of such testimony for the purpose stated is an admission on the part of the plaintiff that the effect of the deed of August 25, 1888, in connection with the paper of June 30, 1888, was to place the title to the premises in the defendant, freed from the interests of his former cotenants.    Otherwise there would have been no necessity for the introduction of the testimony as under the law without the paper Samuel would have held the title, subject to the rights of his former co-owners.    The effect therefore of the evidence offered was to establish a parol trust in the defendant. in favor of his former cotenants.    This is expressly forbidden by the 4th section of the Act of April 22, 1856, P. L. 533, Purd. Dig. 942 pl. 3.

The second reason in support of the plaintiff's contention is that the defendant held the property under a trust ex maleficio, not subject to the limitation of the 6th section of the act of April 22, 1856, but within the proviso of the 4th section of that act.    The 6th section denies any right of action " to enforce any implied or resulting trust as to realty, but within five years after such . . . . trust accrued . . . . unless such . . . . trust shall have been acknowledged by writing to subsist by the party to be charged therewith, within the same period ; provided that as to any one affected with a trust by reason of his

fraud, the said limitation shall begin to run only from the discovery thereof, or when by reasonable diligence the party defrauded might have discovered the same." The 4th section of the act provides that all declarations of trust in land shall be manifested by writing, signed by the party holding the title thereof, or be void, " Provided that where any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise or result by implication or construction of law .... then .... such trust or confidence shall be of like force and effect as if this act had not been passed." It is not alleged that Samuel Watson signed any written declaration of trust in favor of his brothers for the premises in dispute, or that his title was procured by any misrepresentation or fraud so as to enable the plaintiff to avail herself of the proviso to the 6th section of the act. But if such fraud was shown she could get no benefit from this proviso, as she testifies that shortly after her husband's death, which occurred in April, 1891, she had a conversation with Samuel Watson in which he claimed that he had the title to the property absolutely, and would do as he pleased with it. This was a distinct denial of the alleged trust and nearly seven years prior to the bringing of this action, January, 1898. It is however contended that the confidence or trust included within the proviso of the 4th section is of a different character from the implied or resulting trust covered by the 6th section of the act, and hence this case is not subject to the limitation of this latter section of the act.

. The view we take of the case does not render it necessary to discuss or determine this question. It may, however, be suggested that it has been repeatedly held, that trusts arising ex maleficio which are embraced within the proviso of the 4th section of the act of 1856 are also within the 6th section of that act: Christy v. Sill, 95 Pa. 380; Barry v. Hill, 166 Pa. 344. In addition to this it has been held by Mr. Justice SHARSWOOD that the trusts excepted in the proviso of the 4th section of the act are those included in the 6th section of the same act. In discussing and construing the 6th section of the act in Harper's Appeal, 64 Pa. 315, Justice SHARSWOOD delivering the opinion of the court says: " The trusts here meant (in section 6) are evidently those excepted from the provision of the 4th section of the same act, invalidating parol declarations of trust, namely,

' when any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise, or result by implication or construction of law, or be transferred or extinguished by act or operation of law.' "

We are not convinced that Samuel Watson was a trustee ex maleficio. On the contrary, he took the title not in fraud of his co-owners, but with their written consent and by their direction, and hence with their approval of the vesting in him absolutely of the title by the deed of William Thaw. He therefore held the land divested of any claim of his former cotenants and of any trust unless it be one raised by a parol agreement. We agree with the learned judge of the court below, that the evidence submitted was too uncertain and vague to sustain a trust, but that if a trust was created it was within the 4th section of the act of April 22, 1856. The court in his opinion refusing a new trial quotes the material part of the evidence on this point, and we think it fully justifies his conclusions.

The view, therefore, we entertain of the case, is that Samuel Watson had an indefeasible title to the premises, divested of any interest or claim of his former cotenants ; that the testimony adduced by the plaintiff was insufficient to create a trust, and if a trust was raised the act of April 22, 1856 was a complete bar to a recovery.

The assignments of error are overruled and the judgment is affirmed.