## Truver, Appellant, *v.* Kennedy.

Argued January 9, 1967. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

reargument refused May 29, 1967.

*Paul A. Barrett*, with him *Russell J. O'Malley*, and *Nogi, O'Malley & Harris*, for appellant.

*Harry E. Smith*, for appellee.

OPINION BY MR. JUSTICE JONES, April 18, 1967:

On February 2, 1928, Lizzie M. Wilson died, intestate, survived by her husband, three sons and two daughters. Upon her death, title to a property,—consisting of 192 acres of land and situated in Roaring Brook Township, Lackawanna County,—became vested by operation of law in her husband and five children, the former receiving a one-third interest and the latter each a two-fifteenths interest. In 1940, the husband's one-third interest in the property was conveyed to Esther W. Kennedy, one of the two Wilson daughters, who thus became the owner of a seven-fifteenths interest in the property.

In the meantime, taxes on this property not having been paid since 1930, the property was sold at a tax sale to Lackawanna County (County); nevertheless, the five Wilson children retained a right of redemption of the property. By deed recorded on April 18, 1941, the three Wilson sons and one Wilson daughter, Betty W. Truver, conveyed their respective interests in the property to Esther Kennedy. Thereafter, Mrs. Kennedy exercised the right of redemption and, by the payment of $900 in settlement of delinquent taxes owing on the property for the years 1930-1944, inclusive, she

secured a conveyance of the property from the County in her own name. In 1951, Mrs. Kennedy, by two separate deeds, sold to third persons approximately six acres of the property.

On December 13, 1955, Mrs. Kennedy, without consideration, conveyed the remaining portion of the property to her daughter, Charlotte Kennedy, and herself and, on March 29, 1957, the same property was conveyed, without consideration, to Charlotte Kennedy. Although since 1957 several portions of the property have been sold, a considerable portion of the property is still owned by Charlotte Kennedy.

On December 30, 1963, Betty W. Truver instituted an equity action in the Court of Common Pleas of Lackawanna County against Charlotte Kennedy seeking: (a) to restrain her from conveying or encumbering that portion of the property which remains unsold; (b) an accounting of all income which has been realized from the property and all moneys received from the sales of the several portions of the property since she acquired title; (c) a court direction that, after such accounting, she pay over to Mrs. Truver such amount of money as may be found to be due to her. While the equity complaint does not specifically so state, Mrs. Truver seeks to have a trust imposed upon the property to the extent of her claimed two-fifteenths interest therein. Upon issue joined between the parties, the matter was tried before Judge CONABOY; after hearing, the court found that the evidence did not establish any trust, either express or by operation of law, and dismissed the complaint. That decree is the subject of the instant appeal.

Mrs. Truver claims that in April of 1941, after having received several letters from Mrs. Kennedy, she executed a quitclaim deed to Mrs. Kennedy of her interest in the property; that the execution of this deed was upon the express understanding that Mrs. Ken-

nedy would borrow certain money, would put the property in marketable condition, would, by the payment of the delinquent taxes, redeem the property, would then place the property on the market for sale, and, upon a sale of the property, would reimburse herself for the expenses she had incurred and then, from the balance remaining, pay to Mrs. Truver her pro-rata share of the proceeds of the sale; that the basic understanding was that Mrs. Truver's interest in the property would be preserved, in any event, despite her execution of the quitclaim deed.

The real crux of this litigation lies in the construction to be placed on certain letters of Mrs. Kennedy and her counsel,—the authenticity of which letters has been established by the findings of the chancellor,— which immediately preceded the execution of the quitclaim deed and, undoubtedly, motivated Mrs. Truver in the execution of the deed.

On March 29, 1941, Mrs. Kennedy wrote to Mrs. Truver,—who was then living in Texas,—stating that the property had been taken over by the County, that, if "one of us" did not do something, the chance to save the property would be gone, that she and her husband had ascertained that a building and loan association would "advance the money for taxes if one of us has it [the property] in our name," that her father had already executed a deed to her and that the three brothers were willing to do so and she then requested that Mrs. Truver execute a deed conveying her interest in the property. In that letter, Mrs. Kennedy added: ". . . Then I can borrow the money . . . and hold the place for a better sale. If at any time you want to pay your share of the taxes [giving the amount of taxes due] you can do so and get anything out of it there is to get. I am taking the responsibility of paying back the loan company so you certainly won't be out anything and otherwise the place will be lost anyway."

Almost two weeks later—April 10, 1941,—after a conference between the Kennedys and their counsel, Mrs. Kennedy and her counsel each wrote a letter to Mrs. Truver from whom the quitclaim deed still had not been received. In Mrs. Kennedy's letter, she stated that the letter was "written to protect [Mrs. Truver] in the matter. All of the others have signed the deed." Mrs. Kennedy then continued: "Your interest in the property . . . will be preserved upon your giving a deed for same. In other words, you are entitled to two-fifteenths of whatever the property sells for over all ordinary expenses of the sale" and then she reiterated that the taxes had to be paid and the property redeemed if anybody was to receive anything. In his letter to Mrs. Truver, Mrs. Kennedy's counsel advised her to go along with Mrs. Kennedy's proposition for her own best interest, adding: "They [the Kennedys] are willing that on paying the taxes each one will retain his share of the property" and *"They* [the Kennedys] *are willing to give you a guarantee that you will own two-fifteenths (2/15) in the property."* (Emphasis supplied).

Shortly after the receipt of these three letters, Mrs. Truver executed the deed conveying to Mrs. Kennedy her two-fifteenths interest in the property.

As we scrutinize this record certain conclusions are inescapable: (a) the Wilson property, sold to the County at a tax sale, was in danger of being irretrievably lost if it was not redeemed shortly by some or all of the Wilson heirs; (b) to preserve the property, at least for the purpose of selling the property for a price approximating its real value, Mrs. Kennedy was willing to borrow money to effectuate such redemption; (c) the lending agency, as a prerequisite to making a loan, required that the property be conveyed to Mrs. Kennedy; (d) Mrs. Kennedy's father and brothers did convey their respective interests to her; (e) Mrs. Tru-

ver was most hesitant and reluctant to convey her interest in the property; (f) in order to induce Mrs. Truver to convey her interest, Mrs. Kennedy personally and through her counsel assured Mrs. Truver that she, as well as the brothers, would each retain an equitable ownership in the property to the extent of their respective interests:[1] (g) in reliance upon Mrs. Kennedy's promises and assurances, Mrs. Truver conveyed her interest in this property; (h) there is no evidence that, subsequent to Mrs. Truver's conveyance and the redemption of the property, Mrs. Kennedy made any effort to effectuate a sale of this property until in 1951 when she sold two portions of the property to third persons; (i) at the time of the 1951 sales Mrs. Kennedy rendered no accounting to Mrs. Truver or her brothers so far as the record reveals.

From 1928 (when Mrs. Wilson died) until April, 1941, the Wilson children, including Mrs. Kennedy and Mrs. Truver, were tenants in common of this property. Even though the property had been sold at a tax sale

---

[1] The chancellor concluded that the only agreement or understanding between the parties was that Mrs. Truver would be entitled to receive a share *in the property in the event of an immediate sale of the property* and that there "may have been an 'understanding' between [Mrs. Truver] and [Mrs. Kennedy] . . . that if a good sale went through right after [Mrs. Kennedy] mortgaged the property and paid the taxes that then, in that event, [Mrs. Kennedy] would 'send a check' to [Mrs. Truver]." Such conclusion is bottomed on too narrow and restricted a construction of the record facts. Mrs. Kennedy's counsel, *in a letter dictated in the Kennedys' presence*, unequivocally stated the real understanding between the parties when he stated that Mrs. Truver was guaranteed that she "will own two-fifteenths (2/15) in the property" and each of the brothers and Mrs. Truver "will retain their share of the property". Under the chancellor's construction of the understanding Mrs. Kennedy could have eliminated Mrs. Truver's interest in the property simply by not offering the property for sale or by not making an "immediate" sale; such a construction ignores the record facts and offends the common sense of the transaction.

to the County, this tenancy in common continued to exist so long as the County retained title subject to a right of redemption in the owners of the property. See: *Beers v. Pusey,* 389 Pa. 117, 132 A. 2d 346 (1957). From the existence of such tenancy in common certain legal consequences resulted: (1) if one of the tenants in common purchased the property at a judicial sale or by way of redemption, such purchase would have inured to the benefit of all the other tenants in common, the purchaser being considered a trustee for all his cotenants; (2) the tenants in common stood in a confidential relationship to each other with respect to the common property so long as the tenancy in common existed; (3) "... *as between the cotenants,* the passage of time, in itself, ... [would] not bar a cotenant from asserting his claim of ownership in the property. Nothing short of an unequivocal hostile possession for upwards of twenty-one years will effectively bar this right: Beers v. Pusey, supra.": *Lund v. Heinrich,* 410 Pa. 341, 345, 189 A. 2d 581 (1963). See also: *Tanney v. Tanney,* 159 Pa. 277, 282, 28 A. 287 (1893). Application of these legal principles to the instant factual situation places Mrs. Kennedy in a confidential relationship to Mrs. Truver at the time the former was negotiating with the latter to induce her execution of the deed and, moreover, indicates clearly that, if Mrs. Kennedy, without securing these quitclaim deeds, had exercised the right to redemption of this property, she would have been considered a trustee for all her cotenants.

Unquestionably, without Mrs. Truver's quitclaim deed, had Mrs. Kennedy redeemed this property, to the extent of Mrs. Truver's two-fifteenths interest in this property she would have been considered a trustee for Mrs. Truver. Therefore, Charlotte Kennedy, who now stands in Mrs. Kennedy's shoes since she paid no consideration for the conveyance of the property, must

take the position that not only did the circumstances surrounding the deed not lead to the creation of any trust, express or implied, but that the execution of the deed extinguished the possibility that any trust would arise by operation of law by reason of the cotenancy in the property.

In our view, this record reveals unequivocally that the sole reason for Mrs. Truver's execution of this deed was her reliance upon the promises, made by Mrs. Kennedy and her counsel, that her two-fifteenths interest in this property would be preserved for her. Unlike the court below, we find no ambiguity or uncertainty in the representations made to Mrs. Truver nor any lack of clarity in Mrs. Kennedy's promised undertakings.

Were it not for the parol evidence rule (Restatement 2d, Trusts, §38 (1) (pp. 102, 103)), we would have no hesitancy in finding an express trust had been created. The statements made by way of representation to Mrs. Truver, *at the time of execution of the deed*, satisfied the essentials to the creation of a trust. See: *Helfenstein's Estate*, 77 Pa. 328 (1875); *Smith's Estate*, 144 Pa. 428, 22 A. 916 (1891); *Thompson Will*, 416 Pa. 249, 206 A. 2d 21 (1965). Moreover, the letters satisfied the requirement of §4 of the Statute of Frauds[2] that the declaration or creation of a trust "be manifested by writing."

However, the parol evidence rule precludes the declaration of an express trust. Mrs. Truver's deed, absolute on its face, "release[s] and quitclaim[s]" her interest to Mrs. Kennedy, her heirs and assigns for a $1.00 consideration and no ambiguity arises from the deed's language. The written instrument, declares "that [Mrs. Kennedy] is to take the property for [her] own benefit." In the absence of any averment of

---

[2] Act of April 22, 1856, P. L. 532, §4, 33 P.S. §2.

"fraud, duress, mistake or other ground for reformation or rescission", the evidence extrinsic to the instrument, i.e., the letters, is clearly inadmissible to prove an express trust. (Restatement 2d, Trusts, §38). See also: *Sechler v. Sechler*, 403 Pa. 1, 5, 169 A. 2d 78 (1961); *Zahorsky v. Leschinsky*, 394 Pa. 368, 372, 147 A. 2d 362 (1959). In *Porter v. Mayfield*, 21 Pa. 263 (1853), the Court said: "There are cases wherein trusts may be proved by oral testimony; but not in violation of the rule that protects written agreements against such testimony. . . . But evidence that at the time of the conveyance, the vendee agreed to hold the title in trust for the vendor, is a flat contradiction of the written instruments executed by the parties as the bond and the evidence of their relation, and would make them void from the very inception. Oral testimony can have no such power. As between vendor and vendee, such testimony cannot be heard to change a title, absolute on its face, into a trust". (pp. 264-65).

Next we consider whether an implied trust, either resulting or constructive, can be imposed. Section 4 of the Statute of Frauds, supra, contains the following proviso: "Provided, That where any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise or result by implication or construction of law, or be transferred or extinguished by act or operation of law, then and in every such case such trust or confidence shall be of the like force and effect as if this act had not been passed." Section 44 of the Restatement 2d, Trusts, states, inter alia: "Effect of Failure of Oral Trust for Settlor. (1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust,

the transferee holds the interest upon a constructive trust for the transferor, if (a) the transfer was procured by fraud, duress, undue influence or mistake, or (b) the transferee at the time of the transfer was in a confidential relation to the transferor, . . . ." In the case at bar, (1) (a) of §44 clearly does not apply.

The critical issue is whether, in the factual posture herein presented, a constructive trust should be raised.[3] " '. . . a constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.' ": *Gray v. Leibert,* 357 Pa. 130, 135, 53 A. 2d 132 (1947). As Judge (later Justice) CARDOZO, speaking of the purpose of a constructive trust, said, in *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386-89, 122 N.E. 378, 380, 381 (1919) : "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee. . . . A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief."

The existence of a confidential relationship may be found either as a matter of law or as a matter of fact. In *Ringer v. Finfrock,* 340 Pa. 458, 461, 462, 17 A. 2d 348 (1941), this Court said: "[s]uch a relation [confidential relation] is not restricted to any particular

---

[3] We find no justification in the record upon which to raise a resulting trust. ". . . in the instant case, in the absence of any allegation or proof of fraud in obtaining the title or proof that the property was purchased by appellant with his own funds, appellant has not established the existence of a resulting trust. [citing authorities]": *Chambers v. Chambers,* 406 Pa. 50, 54, 176 A. 2d 673 (1962).

personal association. It may exist *as a matter of law* in certain recognized fiduciary relations, as in the case of trustee and cestui que trust, attorney and client, and guardian and ward. It may also exist as a matter of fact wherever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on the one side, or weakness, dependence or justifiable trust, on the other. [citing authorities]." (Emphasis supplied). See also: *Drob v. Jaffe,* 351 Pa. 297, 300, 41 A. 2d 407 (1945) and cases therein cited.[4]

That Mrs. Kennedy and Mrs. Truver were in a confidential relationship is evident; a tenant in common stands in a confidential relationship to another tenant in common with respect to the common property: *Lund v. Heinrich,* 410 Pa. 341, 344, 345, 189 A. 2d 581 (1963). While this Court has never adopted in *toto* comment c, §44, Restatement 2d, Trusts and while we have held that the existence of a close family relationship *per se* does not justify recognition of a confidential relationship[5] (*Brunier v. Stanert,* 369 Pa. 178, 185, 85 A. 2d 130 (1952) ; *Stewart v. Hooks,* 372 Pa. 542, 546, 547,

---

[4] Comment b, §2 of the Restatement 2d, Trusts, draws a distinction between a "fiduciary relation" "and a confidential relation." The latter may exist in the absence of the former but the former includes the latter. (a) A "confidential relation" may exist "not only where there is a fiduciary relation . . ., but also where because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." See: Restatement 2d, Trusts, §44 (1) (b), comment on Section (1) (b), p. 116.

[5] That the relationship of sister to sister does not create a confidential relationship, see: *Thompson Will,* 387 Pa. 82, 99, 126 A. 2d 740 (1956). See also: *Sendick v. Matvey,* 391 Pa. 286, 295, 296, 138 A. 2d 92 (1957) ; *Michalak Estate,* 377 Pa. 532, 535, 105 A. 2d 370 (1954).

94 A. 2d 756 (1953)) and that one stands to another in a confidential relationship where one occupies such a position as reasonably to inspire confidence in the other that he will act in good faith for the other's interest, the confidential relationship of which the Court spoke in those instances was a confidential relationship as a matter of factual proof.

Whether we consider the relationship between Mrs. Kennedy and Mrs. Truver as a fiduciary relationship or as a confidential relationship, we deem that the proof in the case at bar in support of a constructive trust meets the qualitative proof standard of clarity, precision and conviction. See: *Jourdan v. Andrews,* 258 Pa. 347, 102 A. 33 (1917); *Sechler v. Sechler,* 403 Pa. 1, 7, 169 A. 2d 78 (1961). We are of the opinion that the evidence clearly indicates that Mrs. Kennedy and Mrs. Truver "assumed a relation of confidence to which equity will give effect . . . ." *Lalich v. Bankovsky,* 350 Pa. 441, 446, 39 A. 2d 514 (1944).

Not determined by the court below, although raised, is the question whether the instant action is barred either by a statute of limitations or laches. The transfer of Mrs. Truver's interest in this property took place in 1941 and this action was not instituted until December 1963, approximately 22½ years after such transfer. Conveyances of two portions of the property were made and duly recorded in 1951. The remaining portion of the property was conveyed first from Mrs. Kennedy to her daughter and herself in 1955 and later to the daughter alone in 1957. From 1957 to the date of this action, Charlotte Kennedy has made several other conveyances of portions of this property. Mrs. Kennedy, the transferee, died long before the institution of suit.

Mrs. Truver, a Texas resident, claims she did not know of the transfer of the property to Charlotte Kennedy until 1961, four years subsequent to such trans-

fer. When Mrs. Truver visited Lackawanna County in 1961 she asked her niece, Charlotte Kennedy, to explain the presence of houses on the property and who had authorized such construction, and she testified that Charlotte Kennedy told her "she didn't know". It was after such conversation she secured counsel and learned of the property transfers.

The Act of April 22, 1856, P. L. 532, §6, 12 P.S. §83 provides, inter alia: "No right of entry shall accrue, or action be maintained . . . to enforce, any implied or resulting trust as to realty, but within five years after such contract was made or such equity or trust accrued, with the right of entry . . .". This statute applies to constructive trusts: *Silver v. Silver*, 421 Pa. 533, 538, 539, 219 A. 2d 659 (1966); *Watson v. Watson*, 198 Pa. 234, 247-249, 47 A. 1096 (1901). Mrs. Truver maintains that her cause of action *accrued* when Mrs. Kennedy conveyed the premises, without consideration, to Charlotte Kennedy and, thus, rendered herself incapable of carrying out the purposes of the trust. In *Gast v. Engel*, 369 Pa. 137, 141, 85 A. 2d 403 (1952), we held that §6 of the Act of 1856 applies from the moment the conveyance was induced by the confidential relationship, i.e., "at the moment of the transfers." In *Silver v. Silver*, 421 Pa. 533, 219 A. 2d 659 (1966), *Gast* was reconsidered and overruled and the Court held that the five year period of limitation under §6 did not begin to run until the time the grantee had breached the promise to reconvey or until the time the grantor should reasonably have known of the grantee's wrongful retention of the property. (pp. 538, 539). See also: *Security First National Bank v. Ross*, 214 Cal. App. 2d 424, 29 Cal. Rptr. 538 (1963).

Under the position taken by Mrs. Truver, her cause of action accrued in 1957 and the five year period of limitation under §6 of the Act of 1856, supra, expired in 1962. The statute has barred Mrs. Truver's right to maintain this action.

In addition to the impact of the Act of 1856, supra, the action is also barred by the doctrine of laches. In *Wilson v. King of Prussia Enterprises, Inc.*, 422 Pa. 128, 133, 221 A. 2d 123 (1966), Mr. Justice EAGEN, speaking for our Court, said: "The application of the equitable doctrine of laches does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice. [citing authorities]. The question of laches is factual and to be determined by an examination of the circumstances: [citing an authority]."

Where a cestui que trust seeks to enforce his alleged rights against a trustee, either actual or by operation of law, the burden is upon the trustee, who relies on laches, to show that an inordinate length of time has elapsed since the cause of action arose and that, due to changes which have accrued during such lapse of time, the trustee has been prejudiced: *Mulholland v. Pittsburgh National Bank*, 418 Pa. 96, 209 A. 2d 857 (1965); *Barnes & Tucker Co. v. Bird Coal Co.*, 334 Pa. 324, 5 A. 2d 146 (1939).

Laches applies to both express trusts and trusts created by operation of law, whether resulting or constructive: Trusts and Trustees, Bogert, (2d Ed.), §951 et seq., p. 467 et seq.; Scott on Trusts (2d Ed.), Vol. II, §219 et seq., p. 1609 et seq. For reasons previously given, we have concluded that, under the instant circumstances, a constructive trust arose and we further conclude that Mrs. Truver's action is barred by laches.

In determining the question of laches we are mindful that Mrs. Truver has lived many years in Texas, that she only visited Lackawanna County three or four times during the entire period and that her opportunity to know the status of the property involved was some-

what limited due to the distance at which she lived from the site of the property.

However, the instant record reveals a lack of diligence on the part of Mrs. Truver. Between 1951 and 1961, on at least six occasions, portions or all of this property were conveyed and such conveyances were recorded.[6] During this period of time Mrs. Truver made no inquiries whatsoever concerning the status of this property; so far as the record reveals, she made no inquiry whether the taxes were being paid and, if so, by whom, whether the mortgage which Mrs. Truver knew had been placed upon the property by the Kennedys was being paid and, if so, by whom, whether the property was being kept in repair and properly maintained, etc. On the contrary, the record reveals an absence of even minimal curiosity on Mrs. Truver's part as to the status of this property as well as a willingness on her part, through inaction, to let others assume the burdens associated with the care of the property of which she now seeks the benefit. Mrs. Kennedy, the constructive trustee, and her counsel are both now deceased, 22 years has elapsed since the events which led to the creation of the constructive trust took place and that prejudice has resulted is obvious.

The record evidence establishes the existence of a constructive trust but the lack of due diligence on the part of Mrs. Truver bars her from the maintenance of this action.

Decree affirmed. Each party to pay own costs.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I disagree with the conclusion of the majority that Mrs. Truver is barred from obtaining the relief she seeks either because of the statute of limitations or the doctrine of laches.

---

[6] Constructive notice may be sufficient to start the running of laches or the operation of the Act of 1856, supra: *Ross v. Suburban Counties Realty Corporation*, 356 Pa. 126, 51 A. 2d 700 (1947).

In *Silver v. Silver*, 421 Pa. 533, 539, 219 A. 2d 659, 663 (1966), as the majority points out, we held that in an action for the breach of a constructive trust the statute of limitations does not begin to run until the grantee breaches the trust or until the grantor should reasonably know about the grantee's breach. "By starting the statute of limitations running at that time, rather than at the time the conveyance is first made, one enjoying a confidential relationship will not be able to profit by concealing, for a five year period, his intention to dishonor his promise to reconvey property entrusted to him." Ibid. Likewise, the Restatement 2d, Trusts, §409 (1959) requires knowledge of a breach by the beneficiary before he may be barred by laches from enforcing a resulting or constructive trust.

The majority opinion while not suggesting that Mrs. Truver had knowledge of Mrs. Kennedy's conveyances, imposes a duty upon her to have made frequent inquiries about the status of the realty, to have displayed "curiosity". In my view appellant was under no such duty. Mrs. Truver, a resident of Texas, had every right to assume that her sister-trustee would continue to preserve, hold and account for her interest in the property. It was not until she noticed the construction in 1961 that she first had cause to be suspicious and thereafter she immediately demonstrated her concern. Nor do I see how Charlotte Kennedy was unduly prejudiced by the death of her mother, some two months prior to the institution of this suit, and the death of her mother's lawyer. The majority is willing to conclude that the record evidence clearly establishes the existence of a constructive trust, and Charlotte Kennedy as donee stands in the shoes of her mother.

I am in substantial accord with the view taken by Mr. Justice JONES on the remaining issues of this case. Accordingly I dissent from the Court's judgment.

Mr. Justice MUSMANNO and Mr. Justice O'BRIEN join in this dissenting opinion.