IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Karen E. Snizaski and : 
Christine M. Vilsack, : 
        Petitioners : 
  : 
    v. : 
  : 
Public School Employees' : 
Retirement Board, :   No. 1329 C.D. 2008
        Respondent :   Submitted: April 24, 2014

BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE BERNARD L. McGINLEY, Judge (P)
           HONORABLE PATRICIA A. McCULLOUGH, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY           FILED: August 13, 2014

This matter is on remand from the Supreme Court with instructions to consider three outstanding issues raised by Karen Snizaski and Christine Vilsack (Friends/Appellants) in their original appeal from the order of the Public School Employees' Retirement Board (Board) which declared Willette Gallman (Gallman) the Principal Beneficiary of the balance of Six-Hundred Eighty-Eight Thousand Five-Hundred Fourteen dollars **($688,514.00)** in Sandra Lapcevic's (Decedent) Public School Employees' Retirement System (PSERS) Account.

## Procedural Background

On May 29, 2009, this Court reversed an order of the Board which upheld as valid a Nomination of Beneficiary Form, which was altered by Gallman with "Wite-Out" to designate herself the Principal Beneficiary of 100% of Decedent's PSERS Account. This Court held that the altered Form did not meet the technical statutory and regulatory requirements of Section 8507(e) of the Public

School Employees' Retirement Code (Retirement Code), 24 Pa.C.S. §8507(e), because the Decedent did not re-execute it and the changes made by Gallman using "Wite-Out" were not initialed by Decedent.

Based on this Court's ruling that the altered Form was *per se* invalid under 24 Pa.C.S. §8507(e), this Court did not address three alternative issues raised by Friends/Appellants.[1]

The Supreme Court granted Gallman's petition for allowance of appeal to consider one issue:

> Whether the Commonwealth Court correctly interpreted 24 Pa.C.S. §8507(e) to require in this case that a Public School Employees' Retirement System nomination of benefits form must have been completed entirely in the hand of the member/decedent in order to effectuate a valid change of beneficiary designation.

In a decision dated May 28, 2013, the Supreme Court reversed this Court and held that 24 Pa.C.S. §8507(e) does not require nomination of beneficiary forms to be completed by the member or that changes must be made in the

---

[1] Specifically, Friends/Appellants argued that the Board disregarded clear and convincing evidence of a "confidential relationship" between Gallman and Decedent and that Gallman, having access to all of Decedent's important mail, either designated herself as Principal Beneficiary without Decedent's knowledge or consent, or "unduly influenced" Decedent to agree to designate her as Principal Beneficiary. Appellants argued that the Board erred because it failed to shift the burden to Gallman to show that the beneficiary designation was procured without taint of "undue influence" or deception. Appellants/Friends also challenged Gallman's competency under 42 Pa.C.S. §5930, commonly referred to as the Dead Man's Statute, to testify about her conversations with Decedent and relay what the Decedent allegedly "told" her about whom Decedent intended to receive her PSERS death benefits and that Decedent "told" her what to write on the Nomination of Beneficiary Forms.

member's own hand and that any such requirements are unreasonable and impractical.

The Supreme Court remanded the matter to this Court to review the following remaining issues raised by Friends/Appellants:[2] (1) whether the Board erred because it failed to consider the "confidential and fiduciary relationship" between Gallman and Decedent and the resulting presumption of "undue influence;" (2) whether the Board erred because it failed to shift the burden to Gallman to show the absence of deception, that she took no unfair advantage of her relationship with Decedent and that Decedent's designation of Gallman as Principal Beneficiary was fair and beyond suspicion; and (3) whether the Board erred because it failed to exclude Gallman's self-interested testimony about her conversations with Decedent under the Dead Man's Statute.[3]

## **Factual Background**

Decedent was a school teacher in the Penn Hills Area School District for 35.5 years. She was a member of PSERS.

Gallman was Decedent's tax accountant for over 30 years. Gallman began her business relationship with Decedent when Gallman was employed by H&R Block. Gallman saw Decedent about once a year. Transcript of

---

[2] On review of a final adjudication of an administrative board, the Board is the ultimate fact-finder, and our scope of review is limited to determining whether it committed an error of law, constitutional rights were violated, or the Board's factual findings were supported by substantial evidence. Dowler v. Public School Employes' Retirement Board, 620 A.2d 639 (Pa. Cmwlth. 1993).

[3] All issues were properly preserved by Friends/Appellants.

Proceedings, September 12, 2007, (H.T.) at 37-38; Reproduced Record (R.R.) at 96-97.

In 2001, Gallman learned that Decedent, who lived alone, had Parkinson's disease. At the time, Decedent was still working as a teacher but she was assisted by an aid in her classroom. H.T. at 40; R.R. at 98.

### May 6, 2002 Application for Retirement

On May 6, 2002, Decedent completed an *Application for Retirement* (Form PSRS-8).[4]

In Section 7 of the *Application for Retirement*, Decedent designated her elderly and infirm mother, Helen Lapcevic, (Mother), as Principal Beneficiary who was to receive 100% of Decedent's PSERS Account. Decedent nominated two "friends," "Friends/Appellants," as Contingent Beneficiaries, each of whom was to receive 50% of Decedent's PSERS Account in the event Mother predeceased Decedent. June 7, 2002, Application for Retirement, at 5; R.R. at 166.

The record reflects that the "Principal Beneficiary(ies)" and "Contingent Beneficiary(ies)" Sections of the *Application for Retirement* were

---

[4] The record reveals that a portion of the handwriting on the Application for Retirement was Gallman's. From this fact, it may easily be inferred that Gallman assisted Decedent in completing the Application for Retirement. Gallman never testified otherwise.

Decedent withdrew her total contribution and interest in one installment and requested that PSERS directly roll over her tax free funds. June 7, 2002, Application for Retirement, at 3; R.R. at 164. Decedent directed PSERS "to withhold federal income tax withheld from the taxable portion of her monthly payment" based on zero allowances and her single marital status. June 7, 2002, Application for Retirement, at 4; R.R. at 165.

completed by Decedent in her own handwriting and that the percentage under each category of beneficiary was correct in that they each added up to 100%.

PSERS received Decedent's *Application for Retirement* on June 7, 2002.

Decedent's Mother died on July 15, 2002.

### August 2, 2002 Nomination of Beneficiaries Form

Three months after the *Application for Retirement* was submitted and two weeks after Decedent's Mother died, PSERS received a Nomination of Beneficiaries Form (Form PSERS-187) dated August 2, 2002, (hereinafter "*August 2002 Nomination of Benefits Form*").

The Principal Beneficiary was changed to "Willette B. Gallman."

The *August 2002 Nomination of Benefits Form* purported to give Gallman, as the new Principal Beneficiary, **50%** of Decedent's PSERS Account. Friends/Appellants were again listed as Contingent Beneficiaries; but on this Form, they each were to receive **25%** of Decedent's PSERS Account. August 2002 Nomination of Benefits Form, at 1; R.R. at 173.[5]

---

[5] It is undisputed that the only sections filled out by Decedent on this particular Form were: (1) her signature; (2) her social security number; and (3) the date. All other sections on this Form were evidently completed by Gallman.

On the Form, if a member wished for the beneficiary to remain confidential, he/she was to "Check [box] here if you do not want your beneficiary to appear on your annual Statement of Account."

The Principal Beneficiary(ies) and Contingent Beneficiary(ies) sections of the *August 2002 Nomination of Benefits Form* were filled in <u>by Gallman</u>, not the Decedent. Unlike the percentages for each class of beneficiary in the *Application for Retirement*, which were filled-in <u>accurately</u> by Decedent just three months earlier, the percentages in the *August 2002 Nomination of Beneficiaries Form* <u>did not add up</u> to 100%.

By letter dated October 19, 2002, PSERS rejected and returned the *August 2002 Nomination of Beneficiaries Form* because the percentages for each class of beneficiary did not add up to 100%. Letter from PSERS to Sandra Lapcevic, October 19, 2002, at 1; R.R. at 174.

### October 2002 Modified Nomination of Beneficiaries Form

On October 29, 2002, PSERS received the same August 2002 Nomination of Beneficiaries Form, but with "corrections" made to the percentages next to the named beneficiaries (hereinafter "*October 2002 Modified Nomination of Beneficiaries Form*"). Specifically, "Wite-Out" was used and the percentage next to the Principal Beneficiary, Willette Gallman, was changed from **50%** to **100%**. The percentage next to each Contingent Beneficiary, Karen Snizaski and Christine Vilsack was changed from **25%** to **50%**.

PSERS accepted the *October 2002 Modified Nomination of Beneficiaries Form* and indicated that the form was "received and processed." Letter from PSERS to Sandra Lapcevic, December 27, 2002, at 1; R.R. at 176.

At some point in the four months between the time Decedent signed the *October 2002 Modified Nomination of Beneficiaries Form* and March 6, 2003,

6

arrangements were made to have Gallman's nephew, Zinford Mitchell (Attorney Mitchell), prepare a *Power of Attorney* and *Last Will and Testament* for Decedent.

On March 6, 2003, Gallman accompanied Decedent to Attorney Mitchell's office where Decedent signed a *Power of Attorney* which named Gallman as her "Attorney-in-Fact." The *Power of Attorney* gave Gallman immediate and complete control over Decedent's personal and financial affairs. The *Power of Attorney* named Gallman's relative, Shirley Marie Gallman-Posey, as "Attorney-in-Fact" if Gallman predeceased Decedent.

On that same date, Decedent executed her *Last Will and Testament* which named Gallman the sole beneficiary of Decedent's entire estate. The Last Will and Testament, again, named Gallman's relative, Shirley Marie Gallman-Posey, as sole beneficiary if Gallman predeceased Decedent.

The *Power of Attorney* and *Last Will and Testament* were notarized by Doreen Mitchell.[6]

In early August 2004, Decedent was rushed to the hospital "for blood loss via her rectum." Telephone Deposition of Ronald Stiller, M.D. (Dr. Stiller Deposition), August 23, 2004, at 4; R.R. at 23. Her treating physician, Ronald Stiller, M.D. (Dr. Stiller) testified that Decedent required an "emergency guardian" because she needed life-saving surgery. The medical records indicate that Decedent had a history of depression. She was admitted with a gastrointestinal

---

[6] It is unclear from the record if Doreen Mitchell is related to Gallman's nephew, Attorney Mitchell.

bleed, severe malnutrition, and possible intestinal perforation, and she was delirious, in renal failure, and had mouth sores. UPMC Shady Side Hospital Records, August 8, 2004; R.R. at 26-28. A psychiatric evaluation performed by Kurt Ackerman, M.D. (Dr. Ackerman) concluded that Decedent was unable to make decisions. His notes also indicate there were "allegations of possible neglect or abuse which warrant an independent guardian." UPMC Shady Side Hospital Records, August 8, 2004; R.R. at 26.

On October 18, 2004, Decedent was adjudicated a totally incapacitated person by the Court of Common Pleas of Allegheny County. The Court appointed Diane Spivak (Guardian), a social worker, to serve as Decedent's permanent plenary guardian.

Decedent was moved to a personal care home. Gallman was barred from visiting Decedent. H.T. at 67; R.R. at 125.

### 2004 Nomination of Beneficiaries Form

On December 9, 2004, Guardian submitted a Nomination of Beneficiaries Form (hereinafter "*2004 Nomination of Beneficiaries Form*"). Decedent's niece and nephew, Laura and Joseph Lapcevic, were named as Principal Beneficiaries.

Decedent died on February 11, 2006, leaving $688,514 in her PSERS Account. Stipulation of Fact No. 5, September 12, 2007.

8

Following Decedent's death, the 2004 Beneficiaries (Laura and Joseph Lapcevic) and Gallman made separate demands upon PSERS for payment of the death benefits.

PSERS took the position that the *2004 Nomination of Beneficiaries Form* filed by Decedent's Guardian was valid. Gallman appealed and challenged the validity of the *2004 Nomination of Beneficiaries Form* on the ground that the Guardian did not have authority to change a beneficiary without petitioning the court. Friends/Appellants intervened.

The Board stayed all proceedings and directed the parties to proceed in the Court of Common Pleas of Allegheny County, Orphans' Court Division, to determine if the Guardian lacked authority.

On June 28, 2007, the Allegheny County Court of Common Pleas, Orphans' Court Division, ruled that the Guardian lacked authority to submit the December 2004 Nomination of Beneficiary Form to PSERS.

The Board granted Gallman's request to set aside the *2004 Nomination of Beneficiaries Form*.

In subsequent correspondence PSERS informed Gallman that the *August 2002 Nomination of Beneficiaries Form* was invalid because the percentages did not add up to 100%. In addition, PSERS believed the *October 2002 Modified Nomination of Beneficiaries Form* was invalid because "Wite-Out" was used to change the percentages and it was not re-authenticated by Decedent. PSERS concluded that Friends/Appellants, the Contingent Beneficiaries named on

9

Decedent's *Application for Retirement,* to be the last validly named beneficiaries on file with PSERS. Gallman sought reconsideration.

The Board scheduled an Administrative Hearing before a Hearing Examiner to determine how Decedent's PSERS death benefits should be distributed.

### Gallman's Testimony

With respect to Decedent's ostensible motive for making Gallman her beneficiary, Gallman testified that every day for one year she drove Decedent to see her Mother who was in a nursing home. H.T. at 42; R.R. at 100. Gallman testified that she took Decedent to dinner every day.[7] H.T. at 44; R.R. at 103. Gallman also testified that she arranged to have "[Decedent's] house redone and also everything that needed to be done was done from keeping her, seeing that she gets private, uh, health problems, see that her house was cleaned, and just everything you would do in your home to keep her house because she could not do it." H.T. at 45; R.R. at 103. Gallman testified that she did this "until [Decedent] got sick in 2004" and was placed in the hospital. H.T. at 45; R.R. at 103.

Over objections based on hearsay and the Dead Man's Statute, Gallman was permitted to testify[8] with respect to how her name came to appear as the Principal Beneficiary on the *August 2002 Nomination of Benefits Form*:

---

[7] Gallman did not elaborate on who paid for the dinners.

[8] The Hearing Examiner denied PSERS' objections based on the Dead Man's Statute without prejudice, allowed Gallman to testify, and preserved PSERS' objection based on the Dead Man's Statute so that Gallman's cross-examination did not constitute a waiver of the **(Footnote continued on next page…)**

Q. How is it that your handwriting appears on this nomination of beneficiary form that is Exhibit 13?

A. Because she told me this is what she wanted me to do.

MS. MILLS (Attorney for PSERS): Objection. Hearsay.

A. Otherwise, I couldn't do it. (Emphasis added).
****

A. Everything on here I was directed by Ms. Lapcevic [Decedent] because I wouldn't have known these two names on number 2. I wouldn't have known any of that. She directed me on the full form. (Emphasis added).

Q. So what you are saying, by those two names, you mean Ms. Sinzaski's name and Ms. Vilsack's name?

A. That's right.

H.T. at 50, 54; R.R. at 108, 112.[9]

Gallman was asked to explain why the number 50% appeared next to her name on the *August 2002 Nomination of Benefits Form:*

Q. You will note that next to your name is the number 50. Were you directed by Ms. Lapcevic [Decedent] to write that number?

---

**(continued…)**

objection, and so that the Hearing Examiner, and later the Board, could strike the testimony (in whole or in part) if appropriate after taking the matter under advisement.

[9] During her direct exam, Gallman volunteered that she would not have known the names or social security numbers of Friends/Appellants if Decedent had not given her that information; the obvious implication being that there was no way that Gallman could have filled-out the August 2002 and October 2002 Forms without Decedent's assistance and knowledge. However, Gallman left unexplained the fact that she had previously helped Decedent complete her *Application for Retirement* dated May of 2002, which contained the names and social security numbers of Friends/Appellants Contingent Beneficiaries.

> A.　She directed me on everything, but she thought 100 percent was for the full form rather than one section and that's why PSERS sent her back and said – sent the form back and said each area, A and B, had to be 100 percent each. (Emphasis added).

H.T. at 55; R.R. at 113.

With respect to the modifications to the *August 2002 Nomination of Benefits Form* that were done with "Wite-Out," Gallman testified:

> A.　She sat and I sat and she told me what to do. She said this has to be 100 percent in Section A, and it has to be 100 percent in Section B. She says put 100 percent on A and put 50/50 on B.
>
> Q.　Was there a product known as whiteout (sic) used on the original form?
>
> A.　She had it. She had everything right there.
>
> Q.　Did you apply the whiteout (sic) to the form?
>
> A.　Yes.
>
> Q.　At whose direction did you apply the whiteout (sic) to the form?
>
> A.　She told me what to do.
>
> Q.　By "she," you mean Ms. Lapcevic [Decedent]?
>
> A.　Ms. Sandra Lapcevic [Decedent].
>
> Q.　Did she direct you to, after the whiteout (sic) was placed on the form, to write the numbers that we currently see that are written on the form?
>
> A.　Yes.
>
> ****
>
> Q.　Did you read the form?

12

> A.    <u>No, she told me what to do.</u>

\*\*\*\*

> Q.    She could have written the numbers down --

> A.    But she didn't want to.  <u>She told me to do it.</u>

\*\*\*\*

> Q.    You had testified that you did not read the instructions on the back of the beneficiary form.

> A.    <u>No, she had it and she told me what to do.</u>

H.T. at 56-58, 65, 70; R.R. at 114-116, 123, 128. (Emphasis added).

      Gallman was asked whether Decedent signed the August 2002 Nomination of Beneficiary Form <u>before or after</u> Gallman filled in the rest of the information.[10] Gallman indicated that Decedent presented Gallman a blank form that had already been signed by Decedent[11] and she asked Gallman to fill in the rest of the beneficiary information:

> Q.    Mrs. Gallman, I'm going to show you what has been marked as Exhibit 3 and ask you have you seen that

---

[10] The implication was that Gallman had Decedent sign and date a blank Form, which Gallman later completed without Decedent's knowledge.

[11] Notably, Gallman later contradicted herself when she stated that Decedent signed the August 2002 Form <u>after</u> Gallman completed it:

> Q.    After this form was completed, do you know what happened to it?
> A.    She had it. I did what she wanted me to do.
> Q.    The question is, <u>what happened to the form after you completed the form</u>?
> A.    The one here that says August 2, 2002?
> Q.    Yes.
> A.    <u>She signed the form</u>, put the date on it and she prepared it for mail.

H.T. at 49, 55; R.R. at 107, 113 (Emphasis added).

form before?  That's the August 2, 2002 beneficiary form?

A.    Yes.
****
Q.    Did you see her sign this document?

A.    <u>Yes, she sat [it] there in front of me blank and she had put the social security and her signature and the date on there</u>.

Q.    There is other handwriting on this form as well. Whose handwriting is that?

A.    That's my handwriting.

H.T. at 49; R.R. at 107 (Emphasis added).

Gallman was asked whether she discussed Decedent's *Last Will and Testament* before it was signed.  Gallman testified over objection as follows:

Q.    Did you discuss with Ms. Lapcevic this document before it was prepared and signed?

A.    <u>No, she said that - - all she said was that she wanted to put me on her will</u>.

H.T. at 63; R.R. at 121. (Emphasis added).

Caroline Howard, LPN (Nurse Howard), spent a great deal of time with Decedent for four months from August of 2002 through November of 2002. Nurse Howard testified that Decedent had a daily routine which included saving important pieces of mail for Gallman to review when she got to her house.  H.T. at 76-77; R.R. at 134-135.  Nurse Howard did not testify that she saw Decedent read any notifications from PSERS or that she saw Decedent mail the August 2002

14

Nomination of Benefits Form, or the October 2002 Modified Nomination of Beneficiaries Form to PSERS.

No other independent or disinterested witness appeared to testify on Gallman's behalf.

On March 10, 2008, the Hearing Examiner issued her Report and recommended that Decedent's death benefits be paid to Gallman pursuant to the *October 2002 Modified Nomination of Beneficiaries Form*. The Hearing Examiner accepted Gallman's testimony as credible and concluded, *inter alia*, that the Decedent "had white out (sic) among her papers and told [Gallman] to put 100% on A and 50/50 on B." Hearing Officer's Recommendation, March 10, 2008, at 13; Finding of Fact (F.O.F.) No. 55. The Hearing Examiner found that "no evidence was proffered to show that [Gallman] had perpetrated a fraud upon Decedent." Hearing Officer's Recommendation, March 10, 2008, at 10; F.O.F. No. 33.

With regard to whether Gallman was competent to testify under the Dead Man's Statute,[12] the Hearing Examiner concluded that the Dead Man's

---

[12] The Dead Man's Statute provides, in pertinent part, as follows:

**§5930. Surviving party as witness, in case of death, mental incapacity etc**.

…in any civil action or proceeding, where any party to a thing or contract in action is dead … and <u>his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest</u> in the subject in controversy, neither any surviving or remaining party to such thing or contract, <u>nor any other person whose interest shall be adverse to the said right</u> of such deceased…party, <u>shall be a competent witness</u> to any

**(Footnote continued on next page…)**

15

Statute was inapplicable because no right of the Decedent passed to a party of record who represented the Decedent's interests and because Gallman's interest was not adverse to Decedent.

Friends/Appellants filed Exceptions to the Hearing Examiner's Recommendation. Issue V stated: "Did the Hearing Officer inappropriately believe it was the [Friends/Appellants'] burden to show fraud when the law requires a finding that the retiree was free of undue influence of the Claimant [Gallman]?" In addition, Friends/Appellants argued that the Hearing Examiner erred by considering and crediting Gallman's self-interested testimony relating to statements made by Decedent prior to her death, because that testimony was barred by the Dead Man's Statute.

The Board adopted the Hearing Examiner's recommendation with some minor modifications.

With regard to whether the Hearing Examiner failed to consider evidence of a "confidential relationship" between Gallman and Decedent, the Board concluded that the burden was on Friends/Appellants to establish "fraud or concealment." The Board agreed with the Hearing Examiner that "no evidence was presented that proved the existence of fraud." Board Opinion, June 24, 2008, at 4.

---

**(continued…)**

matter occurring before the death of said party….(Emphasis added).
42 Pa.C.S. §5930.

With respect to whether the testimony of Gallman violated the Dead Man's Statute, the Board agreed with the Hearing Examiner that Friends/Appellants did not demonstrate that an interest of the Decedent passed to a party of record who represented the Decedent's interests. The Board specifically found that PSERS did not represent the interests of Decedent.

Friends/Appellants timely appealed to this Court.

As noted, this Court vacated the Board's order on the grounds that the *2002 October Modified Nomination of Beneficiaries Form* was not completed "by the member by written designation" as required by Section 8507(e) of the Retirement Code, 24 Pa.C.S. §8507(e). Because of this Court's disposition of the matter on the first issue, this Court did not address Friends/Appellants' other issues: whether, in light of the clear and convincing evidence of the parties' "confidential relationship," it was Claimant's burden to demonstrate that Decedent was free of "undue influence" when she signed the *2002 October Modified Nomination of Beneficiaries Form* and whether Gallman's testimony was barred by the Dead Man's Statute.

The Supreme Court granted Gallman's Petition for Allowance of Appeal to address the sole issue of whether the *October 2002 Modified Nomination of Beneficiaries Form* met the requirements of 24 Pa.C.S. §8507(e).

On May 28, 2013, the Supreme Court reversed this Court and held that the Board's decision was in accord with Section 8507(e) of the Retirement Code, 24 Pa.C.S. §8507(e). The Supreme Court remanded the matter to this Court for consideration of the remaining issues raised by Friends/Appellants.

17

# I.
## Was Gallman Competent to Testify
## Under The Dead Man's Statute?

Three criteria are necessary to disqualify a witness from testifying under the Dead Man's Statute: (1) the decedent must have had an actual right or interest in the matter at issue; (2) the interest of the putative transferee (Gallman) must be adverse to the interest of the decedent; and, (3) the right of the decedent must have passed to a party of record (either Gallman, PSERS[13] or Friends/Appellants) who represents the decedent's interests. Punxsutawney Municipal Airport Authority, 745 A.2d 666 (Pa. Super. 2000).

The Board held that "at least the third prong has not been met" because no right of Decedent passed to a party of record who represented Decedent's interests. Board Opinion, June 24, 2008, at 4.

Actually, this reasoning was incorrect because under the third prong, Decedent's right did, in fact, pass to Gallman. Gallman, therefore, was the party who represented Decedent's interests. Because her testimony was not "adverse" to Decedent's, she was competent as to all matters occurring during the lifetime of Decedent. Despite the Board's error, this Court agrees with the Board's ultimate conclusion that the Dead Man's Statute did not bar Gallman's testimony, albeit for reasons different than those stated by the Board.

---

[13] Clearly, PSERS did not represent Decedent's interest. PSERS was merely the holder of property on behalf of another but did not know to whom the property should be transferred. In this regard, PSERS is in the same position as a stakeholder in an interpleader action.

First, this dispute involves an "*inter vivos*" transaction. In Pennsylvania, the designation of a beneficiary of pension or retirement plan is deemed to be an *inter vivos* transaction. Fiumara v. Fiumara, 427 A.2d 667 (Pa. Super. 1981). Where the decedent has made a valid transfer of rights during her lifetime the transferee, in effect, "represents" the decedent's interests and stands in the decedent's shoes and will be competent to testify. King v. Lemmer, 173 A. 176 (Pa. 1934).

Where, as here, there is a challenge to the validity of an *inter vivos* gift to a putative transferee, the following test is used to determine if the putative transferee is competent to testify under the Dead Man's Statute:

> [I]f a valid *inter vivos* transfer can be shown by <u>independent evidence before the admission of any testimony by the alleged donee (transferee), the donee (transferee) will be considered to represent the interest of the decedent and will be permitted to testify</u>. Conversely, if the alleged donee (transferee) fails to establish a prima facie gift (transfer) by independent testimony before he takes the stand, he will not be competent to testify.

Friedeman v. Kinnen, 305 A.2d 3, 4 (Pa. 1973) (Emphasis added).

Accordingly, Gallman was required, prior to taking the stand, to demonstrate by *prima facie* evidence that the *inter vivos* transfer was valid.

Prior to taking the stand, Gallman introduced the *October 2002 Modified Nomination of Beneficiary Form*. The Supreme Court upheld the validity of the *October 2002 Modified Nomination of Beneficiary Form*. In reversing this Court, the Supreme Court concluded that Decedent filed with PSERS a valid change of beneficiary by written designation.

19

The Supreme Court's conclusions are controlling. Because Gallman presented *prima facie* evidence of Decedent's donative intent, Gallman represented Decedent's interest and was, thus, competent to testify under the Dead Man's Statute.[14]

Friends/Appellants' first assignment of error is without merit.

## II.

### Did the Board Apply the Wrong Presumptions and Burden of Proof?

The Hearing Examiner found that "no evidence was proffered to show that [Gallman] had perpetrated a fraud upon Decedent." Hearing Officer's Recommendation, March 10, 2008, at 10; FOF No. 33. The Board adopted the Hearing Examiner's finding and concluded that:

> <u>Decedent was presumed competent to have made her beneficiary designation, and her signed nomination of beneficiary form is presumed to accurately express her state of mind</u>. See Estate of McGovern v. State Employees' Retirement Board, 512 Pa. 377, 517 A.2d 523 (1986). This presumption may only be overcome by evidence that is 'clear, precise and convincing.' Id. The burden of proving the existence of fraud or concealment is upon the asserting party by evidence that is clear, precise and convincing. <u>If Intervenors [Friends/Appellants] believed there was fraud, it was their burden to prove it</u>. Estate of Bosico, 488 Pa. 274, 412 A.2d 505 (1980). <u>The Board agrees with the</u>

---

[14] Although the *October 2002 Modified Nomination of Beneficiary Form* constitutes *prima facie* evidence that the form was completed, that Gallman's name appeared as Principal Beneficiary, and it was signed by Decedent, it does not establish the circumstances under which the alleged transfer was made, viz., whether it was authorized by Decedent with Decedent's consent and without undue influence. This will be dealt with in the next issue.

20

> Hearing Examiner that no evidence was presented that proved the existence of fraud.

Board Opinion, June 24, 2008, at 4 (Emphasis added).

Friends/Appellants contend that the Board applied the wrong presumptions, and legal analysis and misplaced the burdens of proof. First, they assert that the Board failed to recognize that there was a "confidential relationship" between Gallman and Decedent. They argue that there was "clear, precise and convincing" evidence of a "confidential relationship;" therefore, the burden shifted back to Gallman to show the absence of any taint of "undue influence."

This Court finds Friends/Appellants are correct. As discussed previously, if it can be established by *prima facie* evidence that an *inter vivos* transfer took place, a presumption of validity arises and the burden shifts to the contestant (Friends/Appellants) to rebut this presumption by clear, precise and convincing evidence. The presumption of validity may be rebutted by establishing that the transferor and transferee had a "confidential relationship" at the time the alleged transfer was made.

Critically, clear and convincing evidence that a confidential or fiduciary relationship exists between a donor and donee or testator and beneficiary raises a presumption that the gift or bequest was the product of undue influence. Banko v. Malanecki, 451 A.2d 1008 (Pa. 1982) (if confidential relationship at time of gift is shown, burden shifts to donee to show absence of taint of undue influence); Frowen v. Blank, 425 A.2d 412 (Pa. 1981) (if confidential relationship exists, the law presumes transactions are voidable); Estate of Reichel, 400 A.2d 1268 (Pa. 1979); In re Fickert's Estate, 337 A.2d 592 (Pa. 1975); In re Bosley, 26

21

A.3d 1104 (Pa. Super. 2011); In re Estate of Luongo, 823 A.2d 942 (Pa. Super. 2003); Estate of Lakatosh, 656 A.2d 1378 (Pa. Super. 1995); In re Estate of Meyers, 642 A.2d 525 (Pa. Super. 1994).

Here, the Board correctly stated the "general rule" that a party seeking to avoid or undo a contract on the basis of fraud bears the burden of proving fraud. This "general rule," however, presupposes contracting parties legally free to deal at arm's length. Young v. Kaye, 279 A.2d 759, 763 (Pa. 1971). When there is evidence of a "confidential relationship" the parties are bound by a much higher duty.

The Supreme Court has explained that where a "confidential relationship" exists, the "general rule" (applied by the Board) which requires an affirmative showing of fraud, does not apply:

> When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage. McCown v. Fraser, 327 Pa. 561, 192 A. 674 (1937); Null's Estate, 302 Pa. 64, 153 A. 137 (1930) ... This well settled doctrine, founded on strong considerations of public policy, renders inapplicable the general rule requiring an affirmative showing of fraud.

Young, 279 A.2d at 763 (citations omitted) (Emphasis added).

"Once a fiduciary or confidential relationship is shown to exist, the burden is shifted to the person who is in such relationship, ... to prove the absence of fraud, and that the transaction was fair and equitable." Ruggeri v. West Forum Corp., 282 A.2d 304, 307 (Pa. 1971) (Emphasis added). *See also* Thomas v.

22

Seaman, 304 A.2d 134 (Pa. 1973); Shaffer v. Shaffer, 23 A.2d 883 (Pa. 1942). To this end, "[s]uch a transaction will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained to him, and done with a knowledge of its consequences." Lochinger v. Hanlon, 33 A.2d 1, 4 (Pa. 1943) (Emphasis added).

Friends/Appellants assert that the Board failed to recognize the "confidential relationship" between Gallman and Decedent. They have consistently argued that Gallman purposefully interjected herself into Decedent's life at or around the time Decedent was vulnerable and making important financial decisions. Friends/Appellants contend that there was "clear and convincing evidence" of a "confidential relationship" between Gallman and Decedent. Therefore, a presumption arose that the designation of Gallman as Principal Beneficiary of Decedent's PSERS Account was the product of "undue influence."

## III.

### Did the Board Fail to Recognize the Confidential Relationship between Gallman and Decedent?

"It is impossible to define precisely what constitutes a confidential relationship." Young, 279 A.2d at 763. A "confidential relationship" exists whenever "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an over-mastering dominance on one side, or weakness, dependence or justifiable trust, on the other." Truver v. Kennedy, 229 A.2d 468 (Pa. 1967) (Emphasis added). The typical case of "confidential relationship" in Pennsylvania has resulted from personal contact between two individuals, as the result of which one

secures an advantage over the other, often by way of friendship. <u>See</u> <u>In Re Estate of Button</u>, 328 A.2d 480 (Pa. 1974) ("confidential relationship" found between an infirm and sickly man and the woman in whose house he resided); <u>Young</u>, ("confidential relationship" existed between an octogenarian and tax consultant since former had no knowledge of tax laws and was dependent upon consultant's advice); <u>McCown v. Fraser</u>, 192 A. 674 (Pa. 1937) ("confidential relationship" found between a woman and a man she "adopted" who was sixty-five years her junior).

In <u>Fiumara v. Fiumara</u>, 427 A.2d 667 (Pa. Super. 1981), John J. Fiumara (the decedent), was a member of the Iron Workers Pension Plan of Western Pennsylvania and as such, was entitled to participate in that plan's welfare and pension benefits. On January 5, 1970, the decedent changed the beneficiary designation from his estranged wife to his two minor children.

In April or May of 1972, the decedent learned he had terminal cancer. The decedent was unable to care for himself and thus moved in with Carolyn Kelly (Kelly), a sister, with whom he had previously been estranged. Later that month an attorney visited the Kelly residence to consult with decedent about his estate. Although the Pension Plan's benefits were never discussed, a Will was drafted at that time making Kelly the sole heir and executrix of the decedent's estate. Afterwards, decedent's physical condition deteriorated. He received medication for pain, was given radiation and chemotherapy, suffered severe weight loss and became confined to the area where he slept. By the time of his death he was entirely dependent on Kelly for all the necessities of life.

A change of beneficiary form, dated March 14, 1973, was signed by decedent and completed by Kelly, who designated herself sole beneficiary of decedent's welfare and pension benefits. Decedent died on March 26, 1973.

The Superior Court concluded that a confidential relationship existed between Kelly and decedent. Decedent was physically debilitated and taking pain medication at the time of the beneficiary designations. He was confined to bed and dependent upon Kelly for all the necessities of life. In addition, the beneficiary designations were completed by Kelly rather than by decedent. The Superior Court held that these facts were more than sufficient to establish the existence of a confidential relationship between decedent and Kelly.

In Foster v. Schmitt, 239 A.2d 471 (Pa. 1968), a confidential relationship was established where the alleged donee was a "constant companion" of the decedent for 47 years, from 1918 until six months before decedent's death on January 18, 1965. The donee "administered practically all of [decedent's] personal and business affairs during the waning years" of decedent's life. Foster, 239 A.2d at 474.

In addition, the alleged donee possessed a "power of attorney" over the decedent's assets. As Justice Roberts stated: "[I]f there be any clearer indicia of a confidential relationship than the giving by one person to another of a power of attorney over the former's entire life savings, this Court has yet to see such indicia." Foster, 239 A.2d at 474.

Here, the record contains evidence of Decedent's deteriorated physical condition, her helplessness, and total dependence upon Gallman.

25

Decedent lived alone. Her Mother was extremely ill. Decedent was unable to drive and relied on Gallman to take her to visit her ailing mother. Decedent had Parkinson's disease and walked with a cane. Decedent experienced tremors or shaking which affected her dexterity. According to Gallman, Decedent did not complete the *October 2002 Modified Nomination of Beneficiary Form* because of it:

> Q.     I think you testified that Ms. Lapcevic [Decedent] wrote her signature, the date and her social security number on these forms.
>
> A.     She wrote the date. I wrote this figure over here, the area code and the phone number.
>
> Q.     So she was able to do all of those things herself?
>
> A.     Yes.
>
> Q.     Can you tell me why she wasn't then able to white out numbers if she wanted numbers whited out?
>
> A.     She might have been shaking.

H.T. at 64; R.R. at 122.

There was evidence that Decedent's physical condition had worsened to the point where she could not perform daily chores; she could not take care of her home, do her own laundry or fill out forms. It was necessary to have Decedent's home specially renovated to make it accessible and livable. Gallman described Decedent as "desperate" around the time when Gallman was made Principal Beneficiary of Decedent's PSERS Account. H.T. at 45; R.R. at 103. Even before this Court, Gallman admits in her Brief that Decedent had a "massive physical disability." Gallman's Brief at 9.

26

The *Application for Retirement* required Decedent to make decisions that had tax implications. At the time the *October 2002 Modified Nomination of Beneficiary Form* was completed, Decedent relied on Gallman for tax advice. Decedent saved important mail for Gallman to review. Decedent permitted Gallman to spend her money by hiring contractors to renovate her home and to hire a nurse. Decedent executed a *Power of Attorney* which named Gallman as her Attorney-in-Fact.[15]

Gallman counters by arguing that there was no evidence that Decedent was "incompetent" or suffered from a "weakened intellect;" therefore, Friends/Appellants did not meet the elements required to shift the burden. Gallman relies on <u>In re Estate of Angle</u>, 777 A.2d 114 (Pa. Super. 2001), which set forth the undue influence test *in a will contest*: (1) there was a "confidential relationship" between the proponent and testator; (2) the proponent receives a substantial benefit under the will; and (3) the testator had a weakened intellect.

However, Gallman misconstrues the law. In cases involving *inter vivos* transactions, it is unnecessary to demonstrate that the decedent was "incompetent." Such a transaction will be condemned, <u>even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor</u>, unless there is full and satisfactory proof that it was the free and intelligent act of the

___

[15] Gallman argues that the *Power of Attorney* was executed on March 6, 2003, "five months" after the *October 2002 Modified Nomination of Beneficiary Form* was filled-out; therefore, it was "too remote in time" to be relevant. Actually, it was just over four months between the time the *October 2002 Modified Nomination of Beneficiary Form* was completed and the *Power of Attorney* was executed. Certainly, it was executed at a time that was not too remote to be relevant to a determination of whether there was a "confidential relationship" at the time of the beneficiary designations.

donor, fully explained to him, and done with knowledge of its consequences. McCown, 192 A. at 676-677. See also Fiumara (standard which applies to testamentary transactions is not applicable to the instant transaction since in Pennsylvania the designation of a beneficiary of a pension plan is deemed to be an *inter vivos* transaction).

This important controversy concerns a substantial amount of money. Again, Friends/Appellants contended that Gallman either designated herself as Principal Beneficiary without Decedent's knowledge or consent or unduly influenced Decedent to name her as Principal Beneficiary.

This Court holds that sufficient evidence exists in the record from which a fact-finder could conclude that there was a "confidential relationship" between Gallman and Decedent when Decedent signed the *August 2002 and October 2002 Nomination of Beneficiary Forms*.

It was incumbent upon the Hearing Examiner and Board to consider whether there was a "confidential relationship" between the parties. However, in the opinion of the Board there is no discussion of this issue and no findings of fact. Instead, the Board perfunctorily accepted Gallman's testimony that Decedent "told her" what to write on the nomination of beneficiary forms. Consequently, it is impossible for this Court to decide at this juncture whether Friends/Appellants made out a *prima facie* case on the issue of "confidential relationship" based on evidence found credible and competent by the Board.

Based on the foregoing, the order of the Board is vacated. The matter is remanded to the Board to remand to the Hearing Examiner for recommended

28

findings of fact and conclusions of law on the issue of "confidential relationship." If it is determined that a "confidential relationship" existed between Gallman and Decedent, Gallman shall be given the opportunity to demonstrate by clear, precise and convincing evidence that the transaction was free of any taint of undue influence or deception and that it was "fair, conscientious, and beyond the reach of suspicion." Leedom v. Palmer, 117 A. 410, 411 (Pa. 1922). *See also* Estate of Clark, 359 A.2d 777 (Pa. 1976).

The matter is remanded to the Board to appoint a Hearing Examiner to conduct an evidentiary hearing and to render a decision in accordance with this opinion.

Jurisdiction is relinquished.

_____
BERNARD L. McGINLEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Karen E. Snizaski and
Christine M. Vilsack,
                Petitioners

        v.

Public School Employees'
Retirement Board,
                Respondent

:
:
:
:
:
:
:
:
:
:    No. 1329 C.D. 2008
:

## **O R D E R**

AND NOW, this 13th day of August, 2014, the order of the Public School Employees' Retirement Board is hereby VACATED. The matter is remanded to the Board to remand to the Hearing Examiner to make findings of fact and conclusions of law on the issue of "confidential relationship." The parties shall be allowed to submit Briefs and proposed findings of fact and conclusions of law. If it is determined that a "confidential relationship" existed between the Decedent, Sandra Lapcevic, the Claimant, Willette Gallman, shall be given the opportunity to demonstrate by clear, precise and convincing evidence that the transaction was free of any taint of undue influence or deception and that it was fair, conscientious, and beyond the reach of suspicion. The Board shall render a decision in accordance with this opinion.

        Jurisdiction is relinquished.

_____
BERNARD L. McGINLEY, Judge

Karen E. Snizaski and Christine M.          :
Vilsack,                                     :
               Petitioners          :
                      :   No.  1329 C.D. 2008
            v.                        :
                      :   Submitted:  April 24, 2014
Public School Employees'                     :
Retirement Board,                            :
               Respondent           :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
                 HONORABLE BERNARD L. McGINLEY, Judge (P.)
                 HONORABLE PATRICIA A. McCULLOUGH, Judge


***OPINION NOT REPORTED***

CONCURRING/DISSENTING OPINION
BY JUDGE McCULLOUGH                 FILED:  August 13, 2014


       This case returns to us following the Supreme Court's disposition in *Snizaski v. Employees' Retirement Board*, 69 A.3d 170 (Pa. 2013), in which the court upheld a determination by the Public School Employees' Retirement Board (Board) that the Nomination of Beneficiary Form received by the Public School Employees' Retirement System (PSERS) on August 2, 2002, naming Willette Gallman (Gallman) as the primary beneficiary of Sandra N. Lapcevic's (Decedent) death benefit, was valid under section 8507(e) of the Public School Employees' Retirement Code, 24 Pa.C.S. §8507(e).  The court vacated our contrary decision and remanded the matter for this Court's consideration of any outstanding issues

raised and preserved by petitioners Karen E. Snisaski and Christine M. Vilsack (Appellants) in their appeal from the Board's decision.

I concur with the Majority's decision that Gallman was competent to testify under the Dead Man's Statute, 42 Pa.C.S. §5930.

However, I respectfully disagree with the Majority's conclusion that the Board's order must be vacated and the case remanded in order for the Hearing Examiner to make additional findings of fact and conclusions of law as to whether a confidential relationship existed between Gallman and Decedent. In my view, the Majority's opinion disregards the substance of the Hearing Examiner's decision, *which explicitly considers the relationship* between Gallman and Decedent, (Hearing Examiner's decision at 23-25, Reproduced Record (R.R.) at 210-12), and then concludes that, "under these circumstances," Decedent's decision to nominate Gallman as her principal beneficiary after Decedent's mother died was "not unreasonable."[1] (R.R. at 212.) Indeed, the Hearing Examiner specifically noted the importance of considering factors other than the disputed document in reaching a disposition and particularly cited "the facts and circumstances surrounding the completion of the [form] as well as the relationship between the Decedent and [Gallman] during the relevant time period . . . ." (R.R. at 210.) Contrary to the Majority's disposition of this appeal, I would address

---

[1] I recognize that the burden applicable to testamentary transactions does not apply to *inter vivos* transactions, such that, in this case, an affirmative showing of fraud is *not* required to shift the burden of proof to Gallman. *Fiumara v. Fiumara,* 427 A.2d 667, 671-72 (Pa. Super. 1981). However, in light of Appellants' repeated assertions of a confidential relationship, although the decisions of the Hearing Examiner and the Board reflect no evidence of fraud, the Hearing Officer's specific examination of the relationship between Gallman and Decedent and express conclusion that the decision to nominate Gallman was "not unreasonable" clearly reflects that neither the Hearing Officer nor the Board was persuaded that a confidential relationship was demonstrated by the evidence.

Appellants' remaining contentions based on the existing record, and I would note that the Hearing Examiner's findings are supported by Gallman's credible and unrebutted testimony.

The relevant facts as summarized by the Supreme Court in *Snizaski* include the following.[2] On June 11, 2002, Decedent retired at age 57 from her position as a public school teacher with the Penn Hills School District. On May 6, 2002, Decedent, who had never married and had no children, submitted an application for retirement to PSERS designating her mother as the primary beneficiary of her pension death benefit and two friends, Appellants, as contingent beneficiaries, who each would receive 50% of the death benefit if Decedent's mother predeceased Decedent.

On July 15, 2002, a little more than a month after Decedent retired, her mother passed away. On August 2, 2002, PSERS received a second nomination form designating Gallman as the primary beneficiary of Decedent's death benefit. Gallman had met Decedent about thirty years earlier when she began preparing Decedent's tax returns.[3] Beginning in 2001, after Decedent was diagnosed with Parkinson's disease, Gallman drove Decedent on a daily basis for more than a year so that Decedent could visit her mother.[4] Decedent was still

---

[2] *Snizaski v. Employees' Retirement Board*, 69 A.3d 170, 172 & n.3 (Pa. 2013).

[3] For the first ten years, Gallman prepared Decedent's taxes while she was employed with H&R Block. Subsequently, Gallman had her own business in the East Hills Shopping Center and then worked from an office situated within her floral business, Gallman's Flower Shop. (R.R. at 97.) Decedent usually visited Gallman several times each year, for tax returns, other questions, or "talk in general." (R.R. at 96-97.)

[4] The Majority states that, in 2001, "Gallman learned that Decedent, who lived alone, had Parkinson's disease." (Majority op. at 4.) The Majority neglects to mention that Gallman learned of Decedent's medical challenges when Decedent, who by then was walking with a cane, came to visit Gallman at her office. (Finding of Fact No. 41) (not altered by the Board).

working during this period, which began approximately 12 months prior to her retirement. During that period of time and until Decedent was hospitalized in 2004, Gallman helped Decedent with household chores, home renovations, and important paperwork, apparently without receiving any compensation for her services.

The second nomination form received by PSERS was signed and dated by Decedent on July 29, 2002,[5] (Hearing Examiner's Finding of Fact No. 9), incorrectly reflected a 50% distribution to Gallman as primary beneficiary and a 25% distribution to each of the two contingent beneficiaries. In October 2002, PSERS returned the nomination form explaining that the percentages must total 100% in each section. Using "Wite-out," Gallman altered the form and inserted the proper distribution percentage for each class of beneficiary. Decedent did not initial the changes or resign the form, which was received by PSERS on October 29, 2002. By letter dated December 27, 2002, PSERS notified Decedent that the nomination form had been received and processed. The letter advised Decedent that if she desired to make any future change to her beneficiary nominations, she must obtain, complete, and forward a new nomination of beneficiary form.

---

[5] Gallman testified that Decedent wrote her social security number and signed and dated the nomination form and that Gallman wrote the rest of the information on the form herself at Decedent's direction. (R.R. at 107-08.) The Majority's statement that "all other sections on this Form were evidently completed by Gallman," (Majority op. at 5 n.5), disregards Gallman's acknowledgement of these facts.

Further, despite Gallman's forthcoming testimony, the Majority examines the handwriting on Decedent's application for retirement, determines that a portion of the handwriting was Gallman's, *infers* that Gallman assisted Decedent in completing the application, and adds that "Gallman never testified otherwise." (Majority op. at 4 n.4.) A peculiar observation, considering that Gallman was never asked.

(Hearing Examiner's Finding of Fact No. 14.)   Decedent made no further beneficiary changes.

Decedent's mental and physical condition began to deteriorate in 2004,[6] *Snizaski*, 69 A.3d at 173, and she was hospitalized for various physical infirmities.  On October 18, 2004, Decedent was adjudicated a totally incapacitated person in the county court of common pleas, and the trial court appointed social worker Dianne Spivak to serve as Decedent's permanent plenary guardian. Subsequently, PSERS received a new nomination of benefits form signed by Spivak and naming Appellants and Laura Lapcevic and Joseph Lapcevic as the primary beneficiaries of Decedent's death benefit.

Decedent died on February 11, 2006.   Gallman successfully challenged PSERS' determination that Appellants and Laura and Joseph Lapcevic were the primary beneficiaries of Decedent's account; ultimately, common pleas court held that Spivak lacked legal authority to change beneficiaries and that the nomination form she submitted was a nullity.  The Board then set aside the third nomination form and ordered an administrative hearing to determine whether the death benefit should be distributed in accordance with the first nomination form or the second nomination form, which named Gallman as sole primary beneficiary.

Evidence was presented regarding PSERS guidelines as well as Gallman's role with respect to second nomination form.  Gallman testified about

---

[6] Gallman testified that, in March 2003, Decedent executed a document granting Gallman a power of attorney and a will naming Gallman as beneficiary of her estate; both documents were prepared by attorney Zinford Mitchell, a nephew of Gallman.  The Hearing Examiner permitted Appellants to solicit this information during Gallman's testimony, but questioned its relevance and noted that the relevant time period concerning the nomination of beneficiaries form was 2002. (R.R. at 119.)

her relationship with Decedent,[7] and she stated that her actions in completing and changing the form were at Decedent's direction.

Caroline Howard, LPN, also testified, stating that she had been hired by Gallman and cared for Decedent daily from 10:00 a.m. to 4:30 p.m. from August to November 2002. Howard stated that at that time, Decedent was mobile but was having some difficulty walking. Howard said Decedent routinely sat at her desk each morning, opened her mail, went through her papers, and made phone calls. Howard said that if there were anything she wanted Gallman to see, "like sale items, clothing or food items on sale or something," she would put them in a pile.[8] (R.R. at 133-35.) Howard testified that Gallman also employed "some agencies," but Howard was not asked to elaborate.[9]

The Hearing Examiner generally found all witnesses to be credible and relied on their testimony to formulate 57 findings of fact. After considering the relationship between Gallman and Decedent, (Hearing Examiner's decision at 23-25, R.R. at 210-12), the Hearing Examiner concluded that, "under these circumstances," Decedent's decision to nominate Gallman as her principal beneficiary after Decedent's mother died was "not unreasonable." (R.R. at 212.)

---

[7] However, as noted by the Supreme Court, no testimony or evidence was introduced regarding what personal connections or familial relationships existed between Decedent and Appellants, Laura Lapcevic, Joseph Lapcevic, or Spivak. *Snizaski*, 69 A.3d at 173 n.5.

[8] Citing this same testimony regarding sales on food or clothing, the Majority states that Decedent saved "important pieces of mail for Gallman to review." (Majority op. at 14.)

[9] The Majority pointedly notes that "no other independent or disinterested witness appeared to testify on Gallman's behalf," (Majority op. at 15), yet does not mention that Appellants presented *no* testimony of their own or from any other individual who might have been familiar with Decedent's circumstances or her relationship with Gallman during the relevant time.

The Hearing Examiner specifically cited "the facts and circumstances surrounding the completion of the [form] as well as the relationship between the Decedent and [Gallman] during the relevant time period," (R.R. at 210), and found that Appellants had proffered no evidence of fraud. Ultimately, the Hearing Examiner recommended that the entire death benefit be paid to Gallman.

Appellants filed exceptions, which the Board denied. Like the Hearing Examiner, the Board expressly found that no evidence of fraud was presented. Appellants then appealed to this Court, which held that the second nomination form had not been completed in accordance with statutory requirements and that PSERS should distribute the funds to Appellants in accordance with the first nomination form. Gallman appealed, and the Supreme Court reversed.

On remand, we now consider Appellants' contention that the Board erred when it failed to recognize a confidential relationship between Gallman and Decedent. The burden of proving the existence of a confidential relationship is on the party asserting it. *Basile v. H & R Block, Inc.*, 52 A.3d 1202, 1210 (Pa. 2012); *Harrison v. Welsh*, 147 A. 507, 509 (Pa. 1929). Again, I note that Appellants offered no testimony relating their own observations or the personal observations of any other individual on this issue. Appellants' contentions depend almost entirely on unsupported allegations and inferences, and, therefore, I would conclude that their burden was not satisfied.

A confidential relationship "is created between two persons when it is established that one occupies a superior position over the other; intellectually, physically, governmentally, or morally, with the opportunity to use the superiority to the other's disadvantage." *Weir v. Estate of Ciao*, 556 A.3d 819, 825 (Pa.

1989).    Stated differently, "a confidential relationship exists when the circumstances make it certain that the parties do not deal on equal terms; where, on the one side there is an overmastering influence, or on the other, weakness, dependence or trust, justifiably reposed." *Id.*   Nonetheless, *"in the absence of actual coercion, overmastering influence does not exist in the abstract."*  *Basile*, 52 A.3d at 1210 (emphasis added).

> Furthermore,
>
> Where [as here] undue influence and incompetency do not appear, and the relation between the parties is not one ordinarily known as confidential in law, **the evidence to sustain a confidential relation must be certain**; it cannot arise from suspicion or from infrequent or unrelated acts; care must be used not to confound acts springing from natural love and affection with confidential relations, and, while the line of demarcation may in some cases be narrow, nevertheless, to sustain the integrity of gifts based on such affection in family relations, it is necessary the distinction should exist.

*In re Estate of Scott*, 316 A.2d 883, 886 (Pa. 1974) (emphasis added).

Appellants present scant argument in support of their position and, other than citations for general statements of law, present no authority applying legal principles to similar facts.  Instead, Appellants merely insist that "the record is full of evidence" that Gallman and Decedent were in a confidential relationship, (Appellants' brief at 8), requiring Gallman to affirmatively prove that the change of beneficiaries on the nomination form was not the result of undue influence.

The Majority supplies the only legal analysis relevant to whether a confidential relationship exists.  I believe that, in doing so, the Majority too briefly summarizes both *Foster v. Schmitt*, 239 A.2d 471 (Pa. 1968), and *Fiumara v.*

*Fiumara*, 427 A.2d 667 (Pa. Super. 1981), thereby disregarding critical facts that undermine the Majority's conclusions.

As described by the Supreme Court, *Foster* presented "still another variation of the of-litigated theme in which the 'devoted friend' and her courtroom adversary, the decedent's relative, clash over the estate of a poor elderly lady who lived in filth and squalor, but actually owned quite a bit of money." *Id.* at 472. The Majority notes that the appellant/alleged donee in *Foster* was a constant companion of the decedent for 47 years and possessed a power of attorney over the decedent's account. However, the Majority does not mention all of the following details. The decedent in *Foster* executed a power of attorney over an account in favor of the appellant in 1957. In 1961, pursuant to the power of attorney, the appellant withdrew the entire account balance and redeposited it in a new account titled only in the appellant's name. In 1964, the appellant withdrew the entire amount in cash.

The decedent was hospitalized in 1964 and, as admitted by the appellant, the decedent began to make demands on the appellant for return of the money. The appellant claimed that she withdrew the cash and returned it to the decedent. However, during a trial in equity, her contention was disbelieved, and the chancellor concluded that the decedent's niece, also her executrix and the sole beneficiary under the decedent's will, was entitled to have a constructive trust impressed on the money found to have been misappropriated by the appellant for her own use.

On appeal in *Foster*, the Supreme Court concluded that the matter fell squarely within the facts and rule cited in *Silver v. Silver*, 219 A.2d 659 (Pa.

1966).[10]  The court also noted that "if there be any clearer indicia of a confidential relationship that the giving by one person to another of a power of attorney over the former's entire life savings, this Court has yet to see such indicia." *Id.* at 474.

In contrast to those facts, Appellant was not Decedent's constant companion for 47 years but nevertheless was a person to whom Decedent turned for help with a personal issue; Appellant did not have a power of attorney when the second beneficiary form was submitted; Appellant did not take money and convert it for her own use; Decedent was not elderly; and, rather than living in filth and squalor, Decedent's home was made more accessible and she was provided nursing care.

The Majority also relies on *Fiumara*, which is similarly distinguishable.  The two appellees in that case were the decedent's only children, whom the decedent named as beneficiaries of his welfare and pension benefits in 1970.  In 1972, the decedent's ex-wife and eight siblings learned that he had terminal cancer.  Shortly thereafter, the pension plan received a change of beneficiary form purporting to change the beneficiary to the decedent's brother, appellant Louis H. Fiumara (Fiumara).  Fiumara subsequently admitted that he signed the decedent's name to the form while the decedent was in surgery; the trial court found the form to be a forgery.

Later that year, the decedent was hospitalized for several weeks.  Afterwards, he was unable to care for himself and moved in with Carolyn Kelly, a sister with whom he had previously been estranged.  Later that month, an attorney

---

[10]  In *Silver*, the court held that a constructive trust could be imposed, even where a transfer of property on its face was absolute, where the plaintiff could show that there existed a confidential relationship between herself and the defendant, that the transfer was accompanied by a promise to reconvey, and that the plaintiff relied on this promise.  *Foster,* 239 A.2d at 474.

visited the Kelly residence and a will was drafted making Kelly the decedent's sole heir and executrix of his estate. From January 1973 through March 1973, the decedent's physical condition deteriorated significantly; he received medication for pain, was given radiation and chemotherapy, suffered severe weight loss, and became confined to the area where he slept. On March 7, 1973, arrangements were made for the decedent to be given last rites; however, on March 11, he was recovered sufficiently to be discharged to his sister's care. A change of beneficiary form, dated March 14, 1973, was signed by the decedent and completed by Kelly, who designated herself the sole beneficiary of the decedent's welfare and pension benefits. On March 16, 1973, another change of beneficiary was signed by the decedent; it too had been completed by Kelly but on this form she designated Fiumara beneficiary of the welfare benefits and retained herself as beneficiary of the pension benefits. The decedent died March 26, 1973.

Throughout his illness, the decedent demonstrated affection and concern for his children, who visited him frequently. He had also remained close to his other siblings and his mother. The chancellor found no facts to explain why the decedent would favor Kelly and Fiumara to the exclusion of those family members, rejecting the evidence offered by Kelly and Fiumara on that issue.

The Superior Court concluded in *Fiumara* that the record established a confidential relationship between Kelly and the decedent, citing in particular the facts that the decedent was physically debilitated and under medication for pain at the time of the March 14, 1973, and March 16, 1973 beneficiary designations; and he was confined to bed and dependent upon Kelly, who completed the beneficiary designations, for all the necessities of life.

Here, Decedent initially signed a change of beneficiary form naming Gallman primary beneficiary of her pension benefit on July 29, 2002, a few weeks after the death of Decedent's mother, who was previously named the primary beneficiary of the pension. This initial change in designation occurred *more than seven months before* Decedent gave Gallman power of attorney on March 6, 2003. The Majority emphasizes that Decedent executed a power of attorney naming Gallman as her attorney-in-fact, (Majority op. at 27 n.15), but acknowledges that the attorney-in-fact relationship did not exist when Decedent and Gallman filled out the beneficiary form. *Pyewell's Estate*, 5 A.2d 123, 124 (Pa. 1939) (concluding that where the decedent gave the contested gifts to the donee prior to granting the donee power of attorney, "these facts could not establish a confidential relation at the time of the gifts.").

According to Howard, during the period from August to November 2002, Decedent was having difficulty walking but was mobile, and was able to leave the house; she went to doctor's appointments. Howard said that at home, Decedent routinely sat at her desk each morning, opened her mail, went through her papers, and made phone calls.[11] Unlike the decedent in *Fiumara*, the record here does not reflect that Decedent was physically incapacitated, taking pain medication, confined to bed, or utterly dependent on Gallman for her life's necessities. Moreover, there is no suggestion that Gallman denied Decedent access to any family members or friends with whom she had a relationship or who inquired about her well-being.

---

[11] In light of Decedent's daily activities, and since Gallman did not have a power of attorney at that time, it would be reasonable to infer that Decedent signed the checks that paid for the modifications to her home and for her nursing and any other expenses.

Appellants cite no case involving similar facts or circumstances. Rather than relying on legal analysis, Appellants attempt to demonstrate the existence of a confidential relationship simply by casting all of Gallman's acts on behalf of Decedent, alone or in total, as evidence of an improper intent or design. The Majority not only accepts Appellants' characterization of the facts, but reaches further into the record, citing Decedent's medical condition in August 2004, - two years after she named Gallman as primary beneficiary - and notations in hospital records – *hearsay on hearsay* – for support.[12] I note that the Majority's opinion contains factual inferences and conclusory statements separate and apart from the findings of fact made by the Hearing Examiner suggesting that Gallman had the motive and opportunity to take advantage of Decedent so as to compel only one conclusion.[13]

---

[12] The Majority refers to Ronald Stiller, M.D., as Decedent's treating physician; however, while Dr. Stiller may have "treated" Decedent during her 2004 hospitalization, these hospital records do not support that inference and instead identify a Keith Kanel, rather than Dr. Stiller, as Decedent's "PCP." (R.R. at 26-28.)

[13] *See, e.g.,* Majority op. at 8, quoting hospital records, "[the doctor's] notes also indicate that there were 'allegations of possible neglect or abuse which warrant an independent guardian.'" This reference to records dated August 8, 2004, *two years after* PSERS received the nomination form listing Gallman as a beneficiary, is irrelevant, double hearsay. Although the Hearing Examiner accepted Gallman's unrebutted testimony as credible, the Majority nevertheless refers to "Decedent's ostensible motive for making Gallman her beneficiary . . . ."

In addition, the Majority references the following testimony:

[Q: Describe what you did for Decedent beginning in 2001.]

A. Well, we went to see her mother in Hospice, *then we also took her* to dinner every day. Every day we went to the hospital to see her mother.

(R.R. at 102) (emphasis added). I understand this to mean that Gallman and Decedent went to the hospital every day, and together they took Decedent's mother to dinner, perhaps in a hospice

I submit that all of the facts cited by Appellants are subject to equally reasonable, and contrary, inferences, suppositions, and conclusions. More important, I believe that what is most notable about the record in this case is what it does not contain, which is any evidence from Appellants in support of their burden. Importantly, the mere "[o]pportunity for undue influence, suspicion and conjecture, do not create or amount to proof of . . . [a] confidential relationship. . . . opportunity is not evidence, and conjecture and suspicion do not take the place of testimony." *In re Thompson's Estate*, 126 A.2d 740, 749 (Pa. 1956) (quotation and citations omitted).

Ultimately, the Majority's analysis urges the hearing examiner to reconsider the evidence and draw an inference from the existing record – that Gallman exerted "overmastering influence" over Decedent and/or defrauded her – which the Hearing Examiner declined to do during his initial consideration of this record. However, whereas I believe that the evidence of record fails to demonstrate that a confidential relationship was present here, I am nevertheless mindful of our scope of review and would leave those assessments of witness credibility and evidentiary weight to the factfinder. Here, the questions presented on appeal have already been addressed and decided below, and the Board's decision is supported by substantial evidence. Accordingly, I would affirm.

On these grounds, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge

---

cafeteria. However, according to the Majority, "Gallman testified that she took Decedent to dinner every day" and gratuitously adds that "Gallman did not elaborate on who paid for the dinners." (Majority op. at 10 and n.7.)